874 A.2d 897

**ATTORNEY GRIEVANCE COMMISSION**

v.

**Norman Joseph LEE, III.**

**Misc. Docket AG No. 8, Sept. Term, 2004.**

Court of Appeals of Maryland.

May 12, 2005.

90

Norman Joseph Lee, III, Bel Air, for respondent.

John C. Broderick, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel for Atty. Grievance Com'n), for petitioner.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, ELDRIDGE and JOHN C. (retired, specially assigned), JJ.

HARRELL, J.

Charges were filed by the Attorney Grievance Commission, through Bar Counsel, against Norman Joseph Lee III, Esquire, arising from a complaint made by Mary Ellen Smith

("Mary Smith") relating to the retention of Lee to pursue the release of her husband, John Henry Smith ("John Smith"), from a Maryland prison. After an evidentiary hearing on the allegations in the complaint, Lee was found by the hearing judge to have violated several rules of professional conduct. Lee argues in his exceptions to this Court that the fairness of his hearing was prejudiced because he was denied the ability to introduce, for the purpose of impeachment, the complainant's assertedly inconsistent statements made by her at the earlier Peer Review proceeding. Lee also argues that Bar Counsel presented testimony and made assertions during the evidentiary hearing that were demonstrably false. Although we shall deny to Lee the ability to utilize at the evidentiary hearing any statements made during the Peer Review proceeding, we remand this matter so that the hearing judge may consider the proffered additional evidence, as identified in Lee's exceptions.

## I.

John Smith, the complainant's husband, was convicted in 1974 of two counts of first degree murder and two counts of arson after a trial by jury in the Circuit Court for Cecil County. On 6 December 1974, the trial court imposed two concurrent life sentences for the murder convictions. For the two arson convictions, Smith was sentenced to two, thirty year terms to run concurrently with each other, but consecutively to the life sentences.

On 12 April 1976, the Court of Special Appeals reversed one of Smith's arson convictions on double jeopardy grounds. *Smith v. State*, 31 Md.App. 106, 113–16, 355 A.2d 527, 532–33 (1976). The other arson conviction was vacated on 5 October 1977 as the result of a successful petition for post-conviction relief filed by the Office of the State Public Defender. Evidence admitted at Lee's evidentiary hearing in the present disciplinary case indicated that, during the period from 1977 to immediately prior to Smith's wife's solicitation of Lee's services, John Smith filed several additional petitions for post-

conviction relief relevant to the murder convictions. All were denied.

At the evidentiary hearing on the charges in the present case, Lee testified that, because of his prior successes in securing post-conviction relief for a number of prisoners, he apparently became well known among the State's prison population as an attorney skilled in post-conviction matters. To assist him with an influx of additional post-conviction and other matters, Lee employed Lester V. Jones, a disbarred, former member of the Maryland Bar. Lee claimed that, although he deferred many of the research duties and other undertakings regarding John Smith's case to Jones, he supervised Jones's work and took steps to ensure that Jones did not engage in the unauthorized practice of law.

Lee explained that John Smith began calling his office from the Western Correctional Institute in Cumberland, Maryland ("WCI"), sometime in January 2001, seeking Lee's advice and an assessment of Smith's hopes for release. On 3 March 2001, John Smith sent a cover letter and several pages of case documents to Lee's office in Harford County, addressed to Jones, seeking Jones's assessment of possible post-conviction relief.[1] The letter also requested Jones to inform John Smith of the cost, if he believed the case to be meritorious, of pursuing his matter in court.

On 21 April 2001, Mary Smith met with Jones at Lee's office in Bel Air, Maryland, to discuss her husband's case. Mary Smith brought to this meeting a portion of the $3500 retainer quoted by Lee and a box of documents and transcripts related to all aspects of her husband's original trial and subsequent post-conviction proceedings. She testified at the evidentiary

---

1. In his letter, John Smith inquired as to the legal merit of a claim brought to his attention by a fellow inmate. The claim apparently rested on the contention that, because Smith's co-defendant had confessed to being the first degree principal and was thereafter sentenced to 25 years in prison, common law legal principles prevented John Smith, who claimed that he was not a first degree principal, from receiving a greater sentence than the first degree principal. Lee asserted, however, that his "research" indicated that John Smith indeed was convicted as a first degree principal.

hearing in this case that she procured these papers from "the archives in Philadelphia."[2] Although Mary Smith initially testified that the box of documents contained "the entire transcript of the original trial and the post conviction," she later temporized that she was "not versed in the law" and was unsure of which specific legal documents were in the box. Lee's view was that, although the box of documents contained several post-conviction transcripts, it did not contain transcripts of John Smith's original 1974 trial. Mary Smith eventually delivered the balance of Lee's retainer in June 2001.

On 28 November 2001, Jones wrote to Mary Smith, stating in his correspondence that a "draft Petition" had been "nearly completed," and that Jones would be forwarding the draft to both John and Mary Smith for their comment. Although Mary Smith testified that she received the 28 November 2001 letter, both she and her husband denied receiving the draft petition.

Lee acknowledged that, during the period between 28 November 2001 and late April 2002, Mary and John Smith made several calls to his office inquiring as to the status of the case. By the end of April 2002, Lee maintained that he had concluded that another post-conviction petition would prove unsuccessful. Despite this conclusion, Lee testified that, in response to Mary Smith's concerns that Lee was not pursuing her husband's matter in a diligent manner, Lee sent letters to attorneys who had represented Smith and his co-defendant at their original trials in 1974 seeking the transcripts from those trials. Although these letters facially were copied to both John and Mary Smith, they denied receiving the copies. Lee was unsuccessful in obtaining the transcripts through the correspondence.

Lee claimed that, at this point, he concluded that John Smith's best option for release from prison would be through the parole process. Then–Governor Parris N. Glendening,

---

2. The record is obscure as to why records of Maryland State court proceedings in Smith's criminal matters would (or could) be obtained from a Philadelphia, Pennsylvania repository.

however, whose term of office would not end until January 2003, had an announced policy of refusing, under most circumstances, to consider the grant of parole for any inmate that was serving a life sentence. Aware of this "life means life" policy, Lee advised John Smith, by telephone, that his best hope for release was to wait until after the inauguration of the next governor in 2003 to request a parole hearing. Although Lee testified that he communicated to John Smith the existence and criteria of the Governor's "life means life" policy, Lee also testified that, in early 2002, against his advice, John Smith requested that Lee immediately seek a parole hearing. In response to this request, he sent a letter on 29 April 2002 to the Maryland Parole Commission requesting a parole hearing, which subsequently was scheduled for sometime in June 2002. Again, although Lee testified that this letter was copied to both John and Mary Smith, they testified that they never received this correspondence. On 30 May 2002, however, John Smith, acting on behalf of himself and without the knowledge of Lee, asked the parole hearing board to withdraw the request for a parole hearing.[3]

Lee claimed that, on 15 May 2002, he sent a letter to John Smith, copied to Mary Smith, in which he stated that, as a result of conversations between himself and John Smith, he would proceed with preparation and filing of a "Petition for a Writ of Error." Bar Counsel presented evidence, however, that neither John nor Mary Smith received this correspondence, and both testified that they were never made aware of, or saw, any work product relating to a "Petition for Writ of Error."

Lee introduced evidence that, on 17 July 2002, Jones sent a letter to Mary Smith, copied to John Smith, in which Jones stated that his review of John Smith's materials and a discus-

---

3. There was conflicting testimony at the evidentiary hearing in this case as to how John Smith became aware of the fact that he was scheduled for a parole hearing. Furthermore, although Lee presented testimony suggesting that he never was informed by WCI that the parole hearing request was withdrawn, an official from WCI testified that Lee never made any inquiries regarding the status of the parole hearing request.

sion with a fellow inmate of Smith led him to the conclusion that he was "comfortable ... that there was some avenue of relief for John ..., including but not limited to Motion to Correct Illegal Sentence, etc." Although Mary Smith admitted that she received this correspondence, Bar Counsel presented evidence that John Smith did not. Neither, however, testified that they received any work product related to the actions proposed in Jones's letter.[4]

Sometime in late 2002, Jones entered the hospital to undergo what Lee characterized as a "routine operation." Although Lee expected Jones to return to his offices within a short period, Jones experienced serious complications from the surgery and did not return to Lee's office. Jones, however, remained in the employ of Lee during the remainder of 2002, working at home during his recuperation.

During the period Jones was working from home, Lee's secretary, Dolores Willis, would bring files to Jones's house for his review. In a memorandum to Lee, dated 11 December 2002, summarizing the status of every open file under Jones's supervision, Jones offered research and general remarks concerning John Smith's case. The memorandum contained a review of John Smith's criminal and post-conviction history, and recommended that, based on the results of Jones's research, Lee should prepare a "Writ of Review to Vacate Judgment." Jones's memorandum also advised Lee that then-Governor-elect Robert L. Ehrlich, Jr. indicated he would consider parole requests on a case-by-case basis (abandoning the "life means life" policy of Governor Glendening) and therefore Lee should consider pursuing a parole hearing request for John Smith following Governor-elect Ehrlich's inauguration.[5]

---

**4.** Despite conflicting testimony as to whether Mary Smith received certain correspondence relating directly to her husband's matter, she did admit to receiving correspondence pertaining to at least two situations, unrelated to the pursuit of a post-conviction petition, in which Lee acted on John Smith's behalf in regard to prison-related issues.

**5.** Lee testified that, sometime later in December 2002, he dismissed Jones from his employment due to concerns over Jones's integrity.

Jones's memorandum encouraged Lee to call Mary Smith so that she could be updated with the information in the memorandum. Mary Smith testified that she did not have any communication with Lee until she called Lee in late December 2002 to request a meeting to review the status of her husband's case. With Jones present, Lee met with Mary Smith on or about 9 January 2003. Mary Smith inquired as to the progress of Lee's research. Lee told Mary Smith that, in order to give her a complete answer to her inquiries, he would need a month to review the transcripts and other documents that she had delivered to his office in April 2001. Mary Smith agreed to Lee's request. Lee claimed that, in the days following their meeting, he spent 6.5 hours reviewing the transcripts.[6]

Approximately two or three weeks after Lee met with Mary Smith, Lee claimed that John Smith called Lee from WCI and left a message instructing him to cease work on his case and refund any unpaid portion of the retainer to Mary Smith. In response, Lee testified he stopped work. Ten days after Lee ceased work, Mary Smith called Lee and instructed him to ignore John Smith's message and resume work on her husband's case. Approximately two to three weeks after Mary Smith's call requesting him to resume work, according to Lee's testimony, Mary Smith called again, this time stating that "she wanted all her files back and she wanted her entire retainer back and if she didn't get it, she was going to cause problems."

Contrary to Lee's version of events, Mary and John Smith testified that they had no knowledge of any telephone calls to Lee requesting him to stop or resume work. Although he placed approximately 188 collect telephone calls to Lee's office over the course of the relevant time period, John Smith

---

**6.** This testimony was corroborated by a client ledger, introduced into evidence by Lee, that contained detailed time records documenting all work done by his office related to the Smith case. Lee, however, testified that the entries on the client ledger were not made contemporaneously with the work indicated, but rather were made subsequent to Mary Smith's complaint and in anticipation of the evidentiary hearing.

testified that he never once spoke directly with Lee, instead always being diverted to Jones. Lee claimed, however, that he had spoken with John Smith on several occasions and, although he may not have participated, he was present, listening on the office speakerphone, for several other conversations between Jones and John Smith.

Mary Smith recalled that, after her meeting with Lee in early January, she made several unsuccessful attempts to contact Lee. Six weeks after the meeting, and with no response from Lee, she emailed Lee and requested a return of her $3500 retainer and her papers. On 4 March 2003, Lee responded via email, stating that he was in the process of reviewing the transcripts but that, if Mary Smith desired, he would cease work, return the transcripts, and refund any unearned portion of the retainer. Lee testified, however, that Mary Smith was unwilling to accept anything less than a refund of the full retainer. Lee also testified that, despite Mary Smith's representations to the contrary, the transcripts were available for her to pick up at her convenience. Mary Smith filed the present complaint, dated 21 April 2003, with the Attorney Grievance Commission ("Commission").

In her complaint, she accused Lee of being "totally unfamiliar" with her husband's matter and failing to act diligently on her requests even though, for almost two years, according to her claims, Lee had all the written materials that he needed to pursue effectively a post-conviction petition. Mary Smith also accused Lee of failing to communicate effectively with her and her husband by either ignoring their requests for information or stringing them along by making unsubstantiated promises regarding the progress being made on John Smith's case.

In his written response, dated 20 June 2003, to the Commission regarding the complaint, Lee characterized Mary Smith's assertions as springing more from a fee dispute than his failure of diligence or communication. In summarizing his office's research and progress on the Smith case, Lee made the following representations:

We attempted to secure transcripts of the proceedings in [the original trials of Smith and his co-defendant]; however, due to the many years since these cases were tried in the early 1970's, the transcripts were not available from either the Courts, the prosecuting attorneys, or the defense attorneys and Public Defenders. Mrs. Smith did eventually provide a box full of transcripts, pleadings, Memorandums of Law, and voluminous research materials that John Henry Smith had used in his many appeals and Petitions for Post Conviction Relief.

Lee also stated that "[f]rom March, 2001 until September, 2002, there was much correspondence to and from my office regarding [John Smith's case]." He explained, however, that once Jones entered the hospital there was not much progress made on the case.

On 17 September 2003, Bar Counsel filed a Statement of Charges against Lee, advancing various violations of the Maryland Rules of Professional Conduct ("MRPC"). Pursuant to the Maryland Rules governing the attorney discipline process, a Peer Review Panel proceeding was held in late 2003 during which both Lee and Mary Smith gave in-person statements.[7] When the Peer Review process failed to resolve the matter, the Commission, on 21 January 2004, directed Bar Counsel to file a Petition for Disciplinary Action against Lee. The petition was filed on 28 April 2004.

The Petition for Disciplinary Action alleged violations[8] of

---

7. As explained more fully *infra*, the Peer Review process, governed primarily by Md. Rules 16–713, 16–723, 16–742, and 16–743, provides a confidential and informal opportunity in which a panel composed of fellow attorneys and at least one lay person determines, based on statements or papers from the complainant(s), the respondent attorney, and any other persons the panel chooses to hear from, whether the matter can be resolved informally or whether dismissal or further, formal disciplinary action should be recommended against the respondent attorney.

8. Prior to the hearing judge taking the case under advisement, Bar Counsel withdrew charges that Lee violated MRPC 1.1, 5.3, and 5.5.

MRPC 1.3 [9] (diligence), MRPC 1.4 [10] (communication), MRPC 1.5(a) [11] (fees), MRPC 1.16(d) [12] (declining or terminating representation), MRPC 8.1(a) [13] (bar admission and disciplinary

---

**9.** MRPC 1.3 states:

Rule 1.3. Diligence.

A lawyer shall act with reasonable diligence and promptness in representing a client.

**10.** MRPC 1.4 states:

Rule 1.4. Communication.

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**11.** MRPC 1.5(a) states:

Rule 1.5. Fees.

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

**12.** MRPC 1.16(d) states:

Rule 1.16. Declining or terminating representation....

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

**13.** MRPC 8.1(a) states:

Rule 8.1. Bar admission and disciplinary matters.

matters), and MRPC 8.4(b), (c), (d)[14] (misconduct). In his answer to the petition, Lee denied any misconduct.

A two day evidentiary hearing was held before Judge Vicki Ballou–Watts of the Circuit Court for Baltimore County on 8 and 13 October 2004. After hearing testimony from Lee, Mary Smith, John Smith, an official from WCI, and Lee's secretary, the hearing judge issued her Findings of Fact and Conclusions of Law on 29 November 2004. She found, by clear and convincing evidence, that Lee violated MRPC 1.3, 1.4(a), 8.1(a), and 8.4(c). Lee violated MRPC 1.3, she concluded, by failing to review personally Smith's case materials for nearly two years; failing to forward to his clients the results of any research or draft documents, as promised in various correspondence; failing to manage properly his workload; and, failing to meet with or speak to John and Mary Smith for nearly a two year period. The hearing judge concluded that Lee violated MRPC 1.4(a) by failing to respond to the Smiths' requests for information, both written and made by telephone; failing to forward the results of any research or draft documents, as promised in various correspondence; and, failing to respond to Mary Smith's repeated requests for the return of transcripts and papers for a period of three weeks. The judge also concluded that Lee "violated [MRPC] 8.1(a) and 8.4(c) when he misrepresented to the Attorney Grievance Commission that the cause for delay in pursuing the legal matter for which he was retained was due to the unavailability of tran-

---

An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact. . . .

14. MRPC 8.4(b), (c), and (d) state:

Rule 8.4. Misconduct.

It is professional misconduct for a lawyer to: . . .

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice; . . . .

scripts." Judge Ballou–Watts, however, found no clear and convincing evidence to support a conclusion that Lee violated MRPC 1.5(a) and 1.16(d). Rather, she was persuaded by Lee's client ledger to conclude that there was not sufficient evidence from which to find that no appreciable work had been performed. She stated that, although it was possible that Mary Smith may have been entitled to a refund of a portion of her retainer, there was insufficient evidence to accurately determine what portion of the fee was unearned.

Lee filed several exceptions to the hearing judge's written Findings of Fact and Conclusions of Law, disputing several, if not most, of the factual findings. Lee also filed a Motion for Reconsideration Based on Fraud, Deceit and Misrepresentation, supported by alleged new evidence that was not introduced or considered at the evidentiary hearing, which he boldly alleged demonstrated that Bar Counsel deliberately had presented false testimony. Lee also argued that the hearing judge precluded him from impeaching Bar Counsel's witness, Mary Smith, by improperly preventing him from introducing evidence of statements reportedly made by her at the Peer Review Panel meeting that supposedly were inconsistent with some of her statements made at the evidentiary hearing. Although Bar Counsel filed a response to Lee's exceptions requesting that his exceptions be overruled, no exceptions were taken by bar counsel to the hearing judge's findings of fact or conclusions of law. Bar Counsel seeks an indefinite suspension as the appropriate sanction for Lee's violations.

## II.

Lee claims that he was denied improperly the opportunity to impeach Mary Smith's testimony by introducing statements made at the Peer Review Panel proceeding that were alleged to be inconsistent with certain statements she made at the evidentiary hearing.[15] During his recross-examination of

_____

**15.** Lee states that "[c]omplainant, Mary Ellen Smith, also gave false testimony to the Court; however, Respondent was precluded from impeaching her testimony, based on [Bar Counsel's] argument to the

Mary Smith, Lee attempted to ask her about statements she allegedly made at the Peer Review Panel proceeding indicating that she had signed a written retainer agreement with him. Mary Smith stated at the evidentiary hearing that she did not recall signing or receiving a retainer agreement from Lee.

***

court that *ANYTHING* said at the Peer Review Hearing was not relevant and could not be used for ANY purpose in the Circuit Court trial." (Emphasis in original). He points to the following exchange between himself and Bar Counsel during Lee's recross-examination of Mary Smith:

[Lee]: Miss Smith, at the peer review hearing you testified—

[Bar Counsel]: I'm going to object. Under the rules governing attorney discipline all matters pertaining to what happens during peer review meeting are confidential without waiver. The Respondent has made reference to the proceeding but without particularity. So I did not interpose an objection. But I would suggest that the confidentiality that the Court of Appeals has imposed upon peer review meetings is for a number of reasons but it is intractable and basically an unwaivable status of confidentiality. So any reference to her previous testimony or even what transpired through the proceeding is not even [sic] not admissible, but not even subject to discussion.

The Court: Well, I don't know what was going to be asked but let me just ask this question of you. Suppose, for example, the witness gave testimony or gave statements at the peer review hearing that Respondent believes are inconsistent with her testimony today. Are you telling me that because of the confidentiality rule he can't question her about her prior inconsistent statements?

[Bar Counsel]: Yes, Your Honor, I am. It is an unqualified rule that the Court adopted that it is totally confidential, can be used for no purposes....

[Lee]: Your honor, I can cut this. I will rephrase the question.

The Court: All right.

Although Lee claims in his motion and exceptions that he was precluded from presenting evidence regarding statements made by Mary Smith at the Peer Review Panel meeting, one reasonably could conclude from this exchange that Lee failed to preserve adequately his objection by acquiescing in Bar Counsel's construction of the confidentiality rule and offering to rephrase his question to avoid implicating statements reputedly made at the Peer Review proceeding. Indeed, we could find in this record no ruling by the hearing judge adopting explicitly Bar Counsel's position with respect to the admissibility of Mary Smith's prior statements. Because we are remanding this case for further proceedings for a different reason and thus it is possible this issue may arise anew then, we shall address this point now.

## A.

The Peer Review process embodied in the current Maryland attorney grievance rules was fashioned in 2001 out of the ashes of the elimination of the former Inquiry Panel and Review Board procedures. Under the former rules, if Bar Counsel believed that a complaint against an attorney was meritorious, he or she would refer that complaint to an Inquiry Panel and give notice to the attorney of the nature of the complaint. Former Md. Rule 16–706(a)(4) (2000). The Inquiry Panel hearing was a relatively formal investigatory tribunal in which three individuals, the majority of which were attorneys licensed to practice in Maryland, would hear testimony from witnesses, receive other evidence, and make formal findings of fact and recommendations as to whether a respondent attorney should be subject to disciplinary sanctions. *Id.* 16–706(d); 16–706(c). Although not strictly governed by the formal rules of evidence, the Inquiry Panels were governed by a procedural scheme similar to a civil trial, allowing witnesses to be subpoenaed, depositions to be taken, and testimony to be taken under oath and transcribed. *Id.* 16–706(d). If the Inquiry Panel determined that the respondent attorney committed misconduct, the panel could recommend that charges be filed against the respondent attorney. *Id.* 16–706(d)(4)(a). If the Inquiry Panel recommended that charges be filed, the panel was required to state, in writing, the basis for the charges and file those reasons, its recommendations, and any evidence utilized at the Inquiry Panel hearing with Bar Counsel, who would then transmit those findings to the Review Board and the respondent attorney. *Id.* 16–706(d)(4)(b).

The function of the Review Board would be to review the findings of the Inquiry Panel and either approve, modify, or reject the panel's recommendation, dismiss the complaint, or remand for further proceedings in front of the Inquiry Panel.[16]

---

**16.** The Review Board consisted of 18 members; 15 members were attorneys selected by the Board of Governors of the Maryland State Bar Association, Inc. ("MSBA"), with the remaining three being non-attorneys appointed by the Attorney Grievance Commission, with the assis-

*Id.* 16–707. If the Review Board agreed with an Inquiry Panel's recommendation that charges be filed, Bar Counsel would then file charges in the Court of Appeals, on behalf of the Commission, against the respondent attorney. *Id.* 16–709. The Court would then designate a hearing judge, who would hold an evidentiary hearing similar to the hearings held under the current rules. *Id.* 16–710; Md. Rule 16–757.

Under the former rules, the proceedings of the Inquiry Panel and the Review Board were not open to the public. Former Md. Rule 16–708. The rules provided that, with certain exceptions,[17] the record of any complaint, investigation,

---

tance and input of MSBA. Former Md. Rule 16–705(d) (2000). A majority of the members of the Review Board was required for a quorum, and the concurrence of not less than a majority of the members present was necessary to make a decision in a case. *Id.* 16–707(a).

**17.** The substance of the these exceptions demonstrates that the general confidentiality rule in former Md.Rule 16–708 was less than absolute. In *Attorney Grievance Commission v. Strathen*, 287 Md. 111, 117–20, 411 A.2d 102, 105–07 (1980), the Court examined and interpreted the exception found in former Md. Rule 16–708(b)(3)(embodied at the time in former Md. Rule BV8(b)(3)), which provided that "[a] judicial tribunal may request and receive any information that is relevant to the business of the tribunal." In *Strathen*, a woman who previously filed a complaint against an attorney that did not result in the filing of charges in the Court of Appeals subsequently brought a legal malpractice claim against the attorney. The attorney filed a motion for the production by the Commission of the transcript of the woman's testimony in front of the Inquiry Panel based on its purported relevance in the malpractice action. The Court held that the transcripts were discoverable because the trial court's need for the transcripts in the malpractice action was well within the plain language of the exception to confidentiality found in former Rule 16–708. *Strathen*, 287 Md. at 119, 411 A.2d at 107.

In *Attorney Grievance Commission v. A.S. Abell Co.*, 294 Md. 680, 687, 452 A.2d 656, 659 (1982), however, the Court narrowed the scope of another exception to the general rule of confidentiality. Although former Md. Rule 16–708(b)(2) (embodied at the time in former Md. Rule BV8(b)(2)) provided that the dispositions of complaints sent to the complainant were not confidential, the Court held that such dispositions could not be disclosed under the Maryland Public Information Act, codified at the time at Md.Code (1957, 1980 Repl.Vol.), Art. 76A, §§ 1–5. The Court held that this exception was essentially for the limited purpose of informing the complainant of the disposition of the complaint, but otherwise was cloaked with the confidentiality of those proceedings. *Id.* at 687, 452 A.2d at 659.

and proceeding of the Inquiry Panel or the Review Board would be private and confidential. *Id.* Once charges were filed in the Court of Appeals, however, that confidentiality did not extend to any further proceedings, which were open to the public. *Id.*

## B.

In 1999 the Court of Appeals began the comprehensive process of revisiting the Maryland rules governing attorney grievance matters in order to address concerns that the process was inefficient and contained certain redundancies. Many members of the legal and judicial communities harbored concerns that the effectiveness of the attorney grievance process was impeded by the relatively sizable lengths of time that often transpired between the initial filing of a complaint and the ultimate disposition by this Court. *See* 144th Report of the Standing Committee on Rules of Practice and Procedure: Hearings Before the Court of Appeals (9 Sept. 1999) (on file at the Court of Appeals). The main source of this delay, it was believed, was the duplicative and redundant nature of a process that included two administrative tiers of relatively formal findings of fact; one by an Inquiry Panel and the other from the evidentiary hearing in front of a circuit court judge. *Id.* In response to these concerns, the Court of Appeals, among other things, determined to eliminate the Inquiry Panel and Review Board and, in their place, create the Peer Review Panel process.

The present attorney grievance process in place for the handling and resolution of the complaint against Lee, as under the former rules, begins when Bar Counsel receives a complaint and initiates an investigation of that complaint. Md. Rule 16–731. At the conclusion of the investigation, Bar Counsel may elect to make one of several recommendations to the Commission, including that the complaint be dismissed, that a Conditional Diversion Agreement [18] be executed be-

---

18. A Conditional Diversion Agreement is an agreement, voluntarily entered into by Bar Counsel and the respondent attorney, that allows

tween Bar Counsel and the respondent attorney, that the respondent attorney be reprimanded, or that the Commission file immediately a Petition for Disciplinary or Remedial Action. *Id.* 16–734. Unlike under the former rules, however, if Bar Counsel determines the complaint to be meritorious, he or she may, in lieu of the other options referenced above, elect to file with the Commission a Statement of Charges,[19] which then is served on the respondent attorney. *Id.* 16–741; Former Rule 16–706(a)(4) (providing that, under the former rules, if Bar Counsel believed a complaint to be meritorious, he or she then would refer the complaint to an Inquiry Panel and give notice to the respondent attorney). The Statement of Charges is a document that alleges specifically any perceived violations of professional misconduct or incapacity and contains a fair summary of the evidence uncovered by Bar Counsel during its investigation. Md. Rules 16–701(m); 16–741. Within 30 days of the filing of a Statement of Charges, the Chair of the Peer Review Committee schedules a Peer

---

the attorney to avoid disciplinary sanctions if he or she acknowledges that he or she engaged in conduct that constitutes professional misconduct and agrees to appropriate remedial conditions, such as restitution, treatment of physical or mental conditions, specific legal education courses, and/or a public apology. Md. Rule 16–736. The Agreement must be approved by the Commission, and may be revoked if the respondent attorney fails to comply with the Agreement or engages in further conduct that would constitute professional misconduct. *Id.*

19. Md. Rule 16–741(a)(1) governs the circumstances under which Bar Counsel may file with the Commission a Statement of Charges:

(a) Filing of Statement of Charges. (1) Upon completion of an investigation, Bar Counsel shall file with the Commission a Statement of Charges if Bar Counsel determines that:

(A) the attorney either engaged in conduct constituting professional misconduct or is incapacitated;

(B) the professional misconduct or the incapacity does not warrant an immediate Petition for Disciplinary or Remedial Action;

(C) a Conditional Diversion Agreement is either not appropriate under the circumstances or the parties were unable to agree on one; and

(D) a reprimand is either not appropriate under the circumstances or (i) one was offered and rejected by the attorney, or (ii) a proposed reprimand was disapproved by the Commission and Bar Counsel was directed to file a Statement of Charges.

Review Panel proceeding.[20] *Id.* 16–742(a).

Like the Inquiry Panel hearings, the Peer Review process features a panel of at least three individuals, comprised of a majority of attorneys and at least one member being a non-attorney,[21] that makes a preliminary determination as to whether formal charges should be filed against the respondent attorney. *Id.* 16–743. Unlike the relative formality of the Inquiry Panel hearing, however, the Peer Review Panel proceeding is an informal, nonadversarial meeting designed to allow Bar Counsel, the respondent attorney, the complainant, and other invited persons to meet and discuss the issues presented in the complaint in an environment similar to a mediation process. *Id.* 16–743. The Peer Review Panel must "allow Bar Counsel, the [respondent] attorney, and each complainant to explain their positions and offer such supporting information as the Panel finds relevant." *Id.* 16–743(c). The Panel may, but need not, hear from any other person upon the request of either Bar Counsel or the respondent. *Id.* The Panel is not governed by any formal rules of evidence, but must respect lawful privileges. *Id.* The meeting is not recorded or transcribed.

The purpose of the Peer Review Panel is not principally to make recommendations as to the appropriateness of formal charges. The Committee Note to Md. Rule 16–743(a) provides a relatively complete description of the purpose of the Peer Review process:

---

**20.** Under the current rules, the only action taken by Bar Counsel that may result in a Peer Review Panel proceeding is the filing of a Statement of Charges. Nonetheless, although the Peer Review process was enacted as a safeguard for the respondent attorney, the attorney is not required to participate in a Peer Review Panel proceeding. Md. Rule 16–743(b)(2). If the Peer Review process is terminated due to the lack of cooperation by the respondent attorney, however, the Commission may take any action that could be taken or recommended by the Peer Review Panel, including the filing of a Petition for Disciplinary or Remedial Action. *Id.*

**21.** Md. Rule 16–742(b).

If a Peer Review Panel concludes that the complaint has a substantial basis indicating the need for some remedy, some behavioral or operational changes on the part of the lawyer, or some discipline short of suspension or disbarment, part of the peer review process can be an attempt through both evaluative and facilitative dialogue, (A) to effectuate directly or suggest a mechanism for effecting an amicable resolution of the existing dispute between the lawyer and the complainant, and (B) to encourage the lawyer to recognize any deficiencies on his or her part that led to the problem and take appropriate remedial steps to address those deficiencies. The goal, in this setting, is not to punish or stigmatize the lawyer or to create a fear that any admission of deficiency will result in substantial harm, but rather to create an ambience for a constructive solution. The objective views of two fellow lawyers and a lay person, expressed in the form of advice and opinion rather than in the form of adjudication, may assist the lawyer (and the complainant) to retreat from confrontational positions and look at the problem more realistically.

If, however, after hearing statements, the Panel determines that the Statement of Charges "has a substantial basis and that there is reason to believe that the [respondent] attorney has committed professional misconduct or is incapacitated, the Panel may ... make an appropriate recommendation to the Commission or ... inform the parties of its determination and allow the attorney an opportunity to consider a reprimand or a Conditional Diversion Agreement." *Id.* 16–743(c)(2). The Panel is authorized to recommend to the Commission that either a Petition for Disciplinary or Remedial Action be filed, the Statement of Charges be dismissed, or that a Conditional Diversion Agreement or reprimand is appropriate. *Id.* 16–743(e). Although the purpose of the Panel proceeding is not to generate any formal findings of fact, the Panel must accompany its recommendation with "a brief explanatory statement." *Id.*

Another major distinction between the Inquiry Panel hearing and the Peer Review Panel proceeding is the level of

confidentiality that is imposed on the Peer Review Panel proceeding. Md. Rule 16–723(a) provides:

> (a) Confidentiality of peer review meetings. All persons present at a peer review meeting shall maintain the confidentiality of all speech, writing, and conduct made as part of the meeting and may not disclose or be compelled to disclose the speech, writing, or conduct in any judicial, administrative, or other proceeding. Speech, writing, or conduct that is confidential under this Rule is privileged and not subject to discovery, but information otherwise admissible or subject to discovery does not become inadmissible or protected from disclosure solely by reason of its use at the peer review meeting.

This language was first proposed in a comprehensive revision to the rules governing attorney grievance matters drafted by a delegated two member working subcommittee of the Court comprised of Judge Alan M. Wilner and the author of this opinion. The subcommittee's draft revisions were delivered to the Court's Standing Committee on Rules of Practice and Procedure ("Rules Committee") for its review and comments. At its 8 September 2000 meeting, the Rules Committee discussed two competing policies regarding the level of confidentiality that should apply to Peer Review proceedings. *See* Minutes of the Standing Committee on Rules of Practice and Procedure, 15–18 (8 Sept. 2000). Some members of the Rules Committee expressed concerns that effectiveness and confidence in the process would be undermined if a respondent attorney could make false statements during the Peer Review Panel proceeding without facing any direct or indirect adverse consequences. *Id.* at 16–17. If a respondent attorney were to make false statements during the Peer Review proceedings, under this view, Bar Counsel would be unable to impeach a false statement later at the evidentiary hearing in front of a judge. To assuage this concern, it was suggested that the proposed rule governing confidentiality include a "prior inconsistent statement" exception that would allow a respondent attorney to be impeached at any subsequent formal evidentiary hearing through the use of statements made at the Peer

Review proceedings. *Id.* at 17. This exception, however, was not included in the Rules Committee's ultimate recommendations to the Court.

The Rules Committee recommended instead that the confidentiality language proposed by the Court's subcommittee be adopted as part of the proposed rules. *Id.* at 18. Even though it interpreted the proposed confidentiality language to circumscribe Bar Counsel's ability to use a statement made during the Peer Review process for the purpose of impeaching a respondent attorney's testimony at a subsequent evidentiary hearing in the matter, the Rules Committee believed that complete confidentiality was essential to the overall purpose of the Peer Review process. *Id.* at 16–18. Establishing a Peer Review process that is informal and confidential would create, the Rules Committee reasoned, an environment in which a respondent attorney is encouraged to speak openly without the fear of direct exposure to potential disciplinary or other adverse consequences. *Id.; see* Committee Note to Rule 16–743(a) (stating that "[t]he goal, in this setting, is not to punish or stigmatize the lawyer *or to create a fear that any admission of deficiency will result in substantial harm,* but rather to create an ambience for a constructive solution" (emphasis added)).

The recommendations of the Rules Committee were communicated back to the Court's subcommittee for its consideration. On 8 November 2000, the sub-committee presented its recommendations regarding the proposed revisions to the rules to the full Court. *See* 144th Report of the Standing Committee on Rules of Practice and Procedure: Hearings Before the Court of Appeals (8 Nov. 2000) (on file at the Court of Appeals). We stated that the confidentiality language in proposed Rule 16–723(a) reflected a "pure policy issue" favoring the complete confidentiality of the Peer Review proceedings.[22] The Court's subcommittee was of the opinion that, in

---

22. The Court's subcommittee also remarked that the language in proposed Md. Rule 16–723(a) was intended to mirror the strict level of confidentiality imposed on the mediation process. *See* Md. Rule 17–

order to encourage candor and openness in the Peer Review process, Bar Counsel should be precluded from using any statement made by a respondent attorney during the Peer Review process for impeachment purposes at any subsequent evidentiary hearing in the matter. The subcommittee stated that this strict confidentiality reflected not only an underlying policy judgment, but also the practical impact of the informal nature of the Peer Review proceedings. Because the Peer Review proceedings would not be recorded or transcribed, nor involve statements given under oath, the subcommittee concluded that any attempt to prove what was said at those proceedings would be unnecessarily burdensome and potentially unreliable. The language in proposed Md. Rule 16–723(a) was approved by the full Court on 30 November 2000, and the new rules, including those governing the Peer Review process, became effective on 1 July 2001.

## C.

In the present case, Lee's exceptions and motion purport to raise the obverse of the specific concerns raised by the Court and the Rules Committee in considering and adopting Rule 16–723(a); that is, whether a complainant's, rather than a respondent attorney's, statements made during the Peer Review process may be used to impeach a complainant's later testimony at the evidentiary hearing in the matter. Lee's issue nonetheless implicates the same policy concerns as those considered by the Court and the Rules Committee. We believe that the language of Rule 16–723(a) clearly indicates that all statements made at a Peer Review Panel proceeding, no matter who the declarant is, remain confidential and privileged and thus unavailable for use to impeach the declarant as a witness at a subsequent evidentiary hearing in that disciplinary process.

The purpose of the Peer Review process is to provide an open and frank environment in which the parties and com-

---

109 (imposing near-absolute confidentiality on all persons present or participating in a mediation).

plainant will feel comfortable to "put it all on the table" in the hopes that they may be able to work, in an informal and cooperative matter, toward a mutually acceptable solution. This environment, however, is accomplished only by allowing both the respondent attorney and complainant the ability to make otherwise conciliatory or potentially inculpatory statements in seeking a mutual solution, without the fear that those statements may be used against him or her at a later hearing.

Although the confidentiality provision was intended facially as a safeguard for attorneys accused of misconduct, an unfortunate byproduct of that confidentiality, as highlighted by Lee's argument in this case, is the possibility that a complainant could undermine the process by using the Peer Review Panel proceeding to audition one version of the "facts" and later change his or her story to suit a different approach.

■ Despite the common sense appeal of permitting use of statements made during the Peer Review process to expose later inconsistencies or intentional misrepresentations, we conclude that the better course is to declaim, borrowing and mutating somewhat a currently popular advertising slogan, "what happens in Peer Review stays in Peer Review." The comprehensive and sweeping language of Md. Rule 16–723(a) reflects our conclusion that the Peer Review process will only be effective if *all* statements made at a Peer Review Panel meeting are insulated from subsequent disclosure in the remaining stages of the attorney grievance process. A respondent attorney who anticipates or expects a complainant or other person will present false or inconsistent testimony at the evidentiary hearing does have, however, some ultimate protections. Once a Petition for Disciplinary or Remedial Action is filed, a respondent attorney is afforded all the discovery tools that are available to litigants in a civil trial, including depositions. Md. Rule 16–756. Using these, a respondent attorney should be able to ascertain a potential witness's position or testimony, under oath, before the evidentiary hearing, thus "freezing" the deponent's account and enabling the attorney to prepare his or her case, irrespective of what may be recollect-

ed regarding what the person may have said at the Peer Review proceeding. If a deponent changes his or her story after being deposed, the respondent attorney has a potent and, more importantly, an admissible weapon to expose a less than truthful witness or one with poor recall.[23] In this case, however, Lee apparently chose not to depose Mary or John Smith.

██ Furthermore, any concerns that a respondent attorney has been prejudiced by false statements made during the Peer Review process are ameliorated by the fact that the respondent attorney ultimately will have the opportunity to confront the complainant, under oath, at an evidentiary hearing. *See Attorney Grievance Comm'n v. Harris*, 310 Md. 197, 202, 528 A.2d 895, 897 (1987) (holding that "any irregularity in the proceedings before the Inquiry Panel and the Review Board ordinarily will not amount to a denial of due process, as long as the lawyer is given notice and an opportunity to defend in a full and fair hearing following the institution of disciplinary proceedings in this Court"); *Attorney Grievance Comm'n v. Stewart*, 285 Md. 251, 259, 401 A.2d 1026, 1030 (1979); *c.f. Bd. of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 205–07, 725 A.2d 1027, 1035–37 (1999) (finding that irregularities in the Peer Review process governing physicians may not serve as the basis for overturning a decision made by the

---

23. Lee's concern bears some resemblance to Bar Counsel's concern, voiced throughout the rules revision process, that a respondent attorney may be tempted to make false statements at the Peer Review Panel meeting because, if the Peer Review Panel members believed the respondent attorney, the panel would recommend dismissal of the complaint and the disciplinary process most likely would end without further action. *See* 144th Report of the Standing Committee on Rules of Practice and Procedure: Hearings Before the Court of Appeals (8 Nov. 2000) (on file at the Court of Appeals). Bar Counsel stated that, to prevent such abuse of the process, he may be forced, in certain situations, to subpoena and depose a respondent attorney before the Peer Review process so that the attorney's statements could be used later for impeachment at the Peer Review Panel meeting. *Id.; see* Md. Rule 16–732 (allowing the Chair of the Commission to authorize the issuance of an "investigative subpoena" if the subpoena is "necessary to and in furtherance of an investigation being conducted by Bar Counsel pursuant to Rule 16–731 . . .").

Board of Physician Quality Assurance after a full evidentiary hearing in front of an administrative law judge).

### III.

■ In his motion, Lee also alleges that the fairness of his evidentiary hearing was prejudiced because Bar Counsel introduced, and the hearing judge relied upon, evidence and testimony that was patently and demonstrably false. At the evidentiary hearing, John Smith testified that he did not receive his copy of Lee's 29 April 2002 letter to the Maryland Parole Commission requesting a parole hearing. Although John Smith did not testify directly whether he received any other correspondence from Lee's office, Bar Counsel made remarks to the hearing judge suggesting that John Smith never received *any* correspondence from Lee's office. These remarks came during recross-examination of Lee by Bar Counsel concerning a visit by Lee to John Smith at WCI in January 2004. The following exchange occurred in this regard:

[Bar Counsel]: Are you aware that [WCI] keeps precise records of not only lawyer visits, but legal mail?

Lee: No, I'm not aware of that.

[Bar Counsel]: So that when you went to the institution and signed in, that's memorialized in their computer data bank?

Lee: Well, it wouldn't surprise me a bit.

[Bar Counsel]: Would it surprise you a bit that when I was ... up there last Monday, I had them check, and the only lawyer visit from Norman Joseph Lee was January 11th, 2004?

Lee: Okay.

[Bar Counsel]: And that there was no legal mail logged into the mailroom for John Henry Smith from 2001 to 2004 from Norman Joseph Lee?

Lee: I absolutely find that unbelievable.

In his motion, Lee states that, subsequent to the evidentiary hearing, he discovered, through his investigatory efforts, that

the mail records from WCI demonstrate that John Smith did receive several pieces of correspondence from Lee's office. These records, included with Lee's motion, indicate facially that, within days of each date indicated on all of the pieces of correspondence that Lee testified were sent to John Smith, John Smith signed for legal mail in the "legal log book" maintained by WCI. This evidence may draw into question John Smith's testimony, and would be contrary to the apparent representations made by Assistant Bar Counsel that the records at WCI showed no legal mail received by John Smith.[24]

 When, subsequent to the evidentiary hearing before a judge, a respondent attorney produces proffered new evidence that may be material to the matter, but was not introduced at the hearing, the Court of Appeals possesses the discretion to remand the proceedings so that the new evidence may be offered and, if admitted, considered by the hearing judge. Bar Counsel contends that, even if the hearing judge

---

**24.** In his motion, Lee also alleges that the Assistant Bar Counsel not only presented false testimony, but knew that the testimony was false when he presented it. In his motion, Lee stated that Assistant Bar Counsel:

> misrepresented [the fact of whether John Smith had received any correspondence from Lee's office] to the Court during trial. If [Bar Counsel] had, in fact, checked the logs during his visit to "prep" John Henry Smith for trial . . ., then he KNEW his witness was testifying falsely. Conversely, if he did not check the logs as he stated, [Bar Counsel] misrepresented to the Court that he had done so. Either way, [Bar Counsel] *deliberately* misled the Court by misrepresenting the nature and content of the logs, by falsely asserting personal knowledge of facts in issue, and/or by assisting his witness to testify falsely.

(Emphasis in original)

In his response to Lee's exceptions, Assistant Bar Counsel explained that he had "a good faith basis for making the inquiry as stated." He stated that, when he went to WCI to interview John Smith in preparation for the evidentiary hearing, he made an inquiry of the guard in charge of admission to the facility as to how to determine whether a particular inmate had received legal mail. Although the WCI guard provided accurate information regarding the number of recent visits by Lee to WCI, Bar Counsel stated that the guard, after communicating with the custodian of the "legal log book," informed Bar Counsel that the log reflected no legal mail from Lee's office.

had considered and believed the new evidence demonstrating that John Smith did receive the correspondence as recounted by Lee in his motion, there would remain evidence sufficient in the record to sustain each of the hearing judge's conclusions that Lee violated MRPC 1.3, 1.4(a), 8.1(a) and 8.4(c).[25] Lee, however, argues that this evidence, and its implications on the overall credibility assessments of Lee and Bar Counsel's witnesses, are potentially material to each of the court's underlying findings of fact and resultant conclusions. We shall remand this matter to the hearing judge so that this evidence may be considered, if admitted.

For example, the hearing judge found that Lee committed violations of MRPC 1.3 by failing to personally review the case

---

**25.** Bar Counsel also argues that Lee's motion was not timely filed with the hearing judge and "attempts to introduce evidence well past the time within which the disciplinary matter was required to have been completed at trial." Petitioner's Response to Respondent's Exceptions at 8. Bar Counsel cites Md. Rule 16–757(a), which provides:

(a) Generally. The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action.

We assume, therefore, in his argument that Lee's motion was not timely filed, Bar Counsel relies on the rule of civil procedure embodied in Md. Rule 2–535(c), which provides that a party may move for a new trial based on newly discovered evidence only if that motion is filed within 30 days after entry of judgment. Lee's motion, however, was filed in this Court on 11 January 2005, more than 30 days after the filing of the hearing judge's Findings of Fact and Conclusions of Law. The short response to this argument is that this Court has original jurisdiction over all matters of attorney discipline. *Attorney Grievance Comm'n v. Christopher*, 383 Md. 624, 638, 861 A.2d 692, 700 (2004) (citations omitted). Although the rules of evidence applicable to civil litigation are applicable to the evidentiary hearing in attorney grievance cases, we reserve the right to order further proceedings following the filing of findings of fact and conclusions of law as justice may require from our review of what is before us.

materials for over two years; failing to forward the results of any research or draft documents, as promised in various correspondence; failing to manage properly his workload; and, failing to meet with or speak to John and Mary Smith for nearly a two year period. The proffered new evidence, however, may draw into question John Smith's credibility on several aspects of this case, most notably the extent of any communication between him and Lee. In concluding that Lee failed to review the case materials or communicate effectively with John Smith, the hearing judge may have discounted (and likely did discount), in favor of John Smith's testimony to the contrary, Lee's testimony that he was familiar, through his own personal research, with John Smith's matter and had participated in conversations with him on several occasions. In concluding that Lee failed to manage properly John Smith's case and forward the results of his research, the hearing judge may have disbelieved, to a greater or lesser degree, Lee's testimony that he regularly kept John Smith informed, by telephone, of Lee's progress and recommendations regarding the strategy best suited to the case.[26]

With regard to the violations of MRPC 1.4(a), the hearing judge found that Lee failed to respond to the Smiths' requests for information, both written and made by telephone; failed to forward the results of any research or draft documents, as promised in various correspondence; and, failed to respond to Mary Smith's repeated requests for the return of transcripts and papers for a period of three weeks. The first two findings suggest that the judge did not find Lee's testimony credible as to the frequency and content of his communications with Mary and John Smith. The proffered new evidence, however, if admitted and found credible, bears directly on John Smith's credibility regarding his testimony concerning the level of communication between himself and Lee. Lee's evidence, in turn, reflects positively on his own credibility, including with

---

26. Lee claimed that, in response to inquiries by John Smith as to certain motions mentioned in correspondence, he communicated the results of his research to Smith and his conclusions that such a motion would be fruitless.

regard to the events surrounding Mary Smith's termination of representation and her attempts to obtain the transcripts.

Finally, the hearing court concluded that Lee "violated [MRPC] 8.1(a) and 8.4(c) when he misrepresented to the Attorney Grievance Commission that the cause for delay in pursuing the legal matter for which he was retained was due to the unavailability of transcripts." At the evidentiary hearing, there was conflicting testimony from Lee and Mary Smith as to precisely what documents were contained in the box that Mary Smith brought to Lee's office in April 2001. The judge's finding that Lee was misleading about his access to the necessary transcripts appears to rest, to some degree, on the hearing judge's rejection of Lee's testimony at the evidentiary hearing that the box of documents that Mary Smith brought to Lee's office did not contain the transcripts needed to pursue an effective post-conviction petition.

The hearing judge also concluded that Lee violated MRPC 8.1(a) and 8.4(c) by making a material misrepresentation when he "stated that [Mary Smith] 'eventually' delivered 'a box full of transcripts, pleadings, Memorandums of Law and voluminous research materials'—falsely implying that these documents were delivered to his office much later than April 21, 2001." The judge stated that Lee "knew this statement was a misrepresentation because he had acknowledged receipt of the same documents in his May 4, 2001 letter to Mr. Smith." Lee claimed, however, that it was his best recollection that, in addition to her delivery of a box of documents in April 2001, Mary Smith also brought to his office more documents later in June 2001.

■ Each of the hearing judge's conclusions of a violation of the MRPC represents, to one degree or another, a rejection of Lee's testimony in favor of the testimony of either John or Mary Smith. Although the proffered potential evidence of John Smith's receipt of certain correspondence may not be directly relevant to all of these violations, if this evidence is received, it bolsters the credibility of Lee's previously rendered testimony. When new evidence that reflects materially

and positively on the veracity of the attorney's earlier testimony is brought to the Court's attention subsequent to the evidentiary hearing, we reserve the right to remand the case so that the hearing judge may consider properly whether to admit that evidence and, if so, what effect it has on the credibility assessments previously made and conclusions drawn. This is especially true, in cases such as the present one, where the findings of fact and conclusions of law depend heavily on the determination of the credibility of two or more material witnesses with directly contrary accounts of material events.

CASE REMANDED TO THE HEARING JUDGE OF THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.

RAKER, J., concurs.

RAKER, J., concurring:

I would hold that an inconsistent statement may not be used as substantive evidence, but, in order to prevent perjury and to protect the integrity of the judicial process, that a prior inconsistent statement may be used for impeachment purposes. *Cf. Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct. 643, 646, 28 L.Ed.2d 1 (1971) (permitting criminal defendant's credibility to be impeached by use of prior inconsistent statement and holding that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances"). Although confidentiality is important in peer review proceedings, it is not always sacrosanct and must yield to the right of an attorney to defend him or herself in these most serious of disciplinary proceedings. *Cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 61, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987) (holding that a defendant's due process right entitled him to know whether protective services' confidential file on the alleged abuse of his daughter contained information that may have changed the outcome of his trial

had it been disclosed); *Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974) (holding that a defendant's right to juvenile records to impeach the credibility of the State's witness outweighed the State's interest in maintaining the confidentiality of such records). I concur in the judgment of the Court remanding this matter for further hearings in the Circuit Court. I disagree, however, with the Court's holding that all statements made at a Peer Review Panel remain totally confidential and privileged and, therefore, are unavailable for use to impeach a witness as a prior inconsistent statement at a subsequent evidentiary hearing in that disciplinary process.

I do not find that the plain reading of the Rule requires the conclusion that *all* statements, no matter who the declarant is, be unavailable for use to impeach a witness against an attorney at a subsequent disciplinary hearing against that attorney. While the laudatory purpose of the Rule is to promote candor and an open and frank environment, the purpose cannot be to protect false statements. *See Hernandez v. State,* 203 Ariz. 196, 52 P.3d 765, 768–69 (2002) (en banc) (holding that inconsistent statements made during confidential compromise negotiations are admissible at a subsequent hearing for impeachment purposes because excluding impeachment evidence would not further the policy of encouraging complete candor); 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5314 (1980) (stating that "[t]he purpose of [Federal] Rule 408 [ precluding use of statements made during compromise negotiations] is to foster 'complete candor' between the parties, not to protect false representations"); *see also* Lynne H. Rambo, *Impeaching Lying Parties with Their Statements During Negotiation: Demysticizing the Public Policy Rationale Behind Evidence Rule 408 and the Mediation-privilege Statutes,* 75 Wash. L.Rev. 1037 (2000) (postulating that reliance on the public policy rationale to preclude impeachment protects only dishonest parties and proposing a qualified approach to allow impeachment).