32 A.3d 30

**Charles Y. KIM**

**v.**

**MARYLAND STATE BOARD OF PHYSICIANS.**

**No. 1, Sept. Term, 2011.**

Court of Appeals of Maryland.

Nov. 29, 2011.

Frederick W. Goundry, III (Varner & Goundry, Frederick, MD), on brief, for petitioner.

Thomas W. Keech, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS, BARBERA, JJ.

BARBERA, J.

Maryland Code (1981, 2009 Repl. Vol.), § 14–404 of the Health–Occupations Article, provides, *inter alia*, that the Board of Physicians ("Board") has the authority to sanction a physician licensed in Maryland if the licensee: "is guilty of: Immoral ... or unprofessional conduct in the practice of medicine," § 14–404(a)(3); "Willfully makes or files a false report or record in the practice of medicine," § 14–404(a)(11); or "Willfully makes a false representation when seeking or making application for licensure or any other application related to the practice of medicine," § 14–404(a)(36). This case calls upon us to determine whether the Board erred in finding that Petitioner Charles Y. Kim violated each of the above subsections of § 14–404,[1] when he falsely indicated on an application for renewal of his license that he was not involved in a medical malpractice action. For the reasons that follow, we hold that the Board committed no error.

## I.

Petitioner came to the United States in 1973. He received his initial license to practice medicine in Maryland in 1977. He practices in the area of Obstetrics and Gynecology and is board certified.

In June 2005, a medical malpractice lawsuit was filed in the Circuit Court for Frederick County, naming Petitioner as a defendant ("the Wagner case"). Petitioner answered the complaint in July 2005, and was deposed in November 2005. The

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court. He did not participate in the decision or adoption of this opinion.

1. The conduct at issue in the present case occurred in 2006. There have been no substantive amendments to § 14–404 since 2006 that materially affect this case. Therefore, all statutory citations, unless otherwise indicated, refer to Maryland Code (1981, 2009 Repl. Vol.), Health Occupations Article.

Wagner case was pending when, on February 23, 2006, Petitioner filed an application for renewal of his privileges at Frederick Memorial Hospital. The application asked: "Have any professional liability or malpractice claims been made against you during the past two years?" Petitioner initially marked "No" in response to that question but then amended his response and marked "Yes." Petitioner also submitted a handwritten addendum to the application. The addendum provided additional information about three malpractice matters: two concluded matters and the Wagner case, which was scheduled to be tried in November 2006.

Then, on August 15, 2006, Petitioner filed with the Board an application for Renewal of Medical License ("the application"). The application included three questions relevant to the present matter, to all of which Petitioner responded "No."

CHARACTER AND FITNESS QUESTIONS

6. The following questions pertain to the period since July 1, 2004. If this is your first renewal, these questions apply to the period commencing with the date of your initial licensure or reinstatement.

SINCE JULY 1, 2004

\* \* \*

m. Have you been named as a defendant in a filing or settlement of a medical malpractice action?

\* \* \*

If you answered "YES" to any of questions 6(a) through (q), attach a separate page with a complete explanation of each occasion. Each attachment must have your name in print, signature and date.

\* \* \*

13. HEALTH CARE ALTERNATIVE DISPUTE RESOLUTIONS QUESTIONS

The following questions pertain to the period since July 1, 2004. If this is your first renewal, these questions apply to

the period commencing with the date of your initial licensure or reinstatement.

* * *

b. Have you, your partners or associates or anyone in your immediate family or household, been sued or had a claim filed against you or any of them for medical malpractice?

* * *

f. Are you, or any member of your immediate family or household, currently a party in a medical malpractice case?

In November 2006, Petitioner's counsel was attempting to schedule a Case Resolution Conference ("CRC"),[2] for an unrelated matter. During the conversation with the Assistant Attorney General who was prosecuting the matter on behalf of the Board, Petitioner's counsel revealed that Petitioner was scheduled to be in court on the date proposed for the CRC in that unrelated matter. That disclosure led to further investigation by the Board, which learned that Petitioner, despite the responses provided in his license renewal application, had been involved in a malpractice action at the time he submitted his application in August 2006.

On March 5, 2007, the Board charged Petitioner with violating the three subsections of § 14–404 that we mentioned at

---

**2.** " 'Case resolution conference (CRC)' means a committee composed of Board members who make recommendations to the Board with regard to proposed disposition of matters before hearing." COMAR 10.32.02.02.B(7).

COMAR 10.32.02.03.C(7) provides, in pertinent part:

(7) Case Resolution Conference.

(a) After service of charges or the response to the notice of intent to deny, the Board shall offer the respondent a CRC which is a voluntary, informal, and confidential proceeding to explore the possibility of a consent order or other resolution of the matter.

(b) If there is no basis for an agreement between the respondent and the administrative prosecutor, the matter proceeds to a hearing.
* * *

(d) Except for consideration of a proposed resolution of a case achieved through the CRC, the Board may not make later use of any commentary, admissions, facts revealed, or positions taken, unless the subject matter is available from other sources or is otherwise discovered.

the outset: subsection (a)(3), which prohibits unprofessional conduct in the practice of medicine; (a)(11), which prohibits the willful making of a false report or record in the practice of medicine; and (a)(36), which prohibits the willful making of a false representation when making an application for licensure or any other application related to the practice of medicine. The Board requested that Petitioner be reprimanded, take a course on ethics, and be required to pay a $10,000 fine.

### Administrative Proceedings

Petitioner asked for and received a hearing before an Administrative Law Judge ("ALJ") of the Office of Administrative Hearings. Petitioner moved to dismiss the charges, asserting that the Board impermissibly pursued the charges based on confidential information received from Petitioner's counsel while scheduling the unrelated CRC. Petitioner relied in support of his argument on COMAR 10.32.02.03.C(7)(d), which provides: "Except for consideration of a proposed resolution of a case achieved through the CRC, the Board may not make later use of any commentary, admissions, facts revealed, or positions taken, *unless the subject matter is available from other sources or is otherwise discovered.*" (Emphasis added.)

The ALJ denied the motion, in a written order, on three grounds: knowledge of the existence of the Wagner case was available from two other sources, the Maryland Health Claims Arbitration Office and the public judiciary website; the information Petitioner's counsel had disclosed was unrelated to the merits of the CRC proceedings; and, in any event, the Board had relied, not on counsel's disclosure but rather, on information discovered through its own investigation and obtained from other sources.

The merits hearing took place on July 12, 2007. The compliance analyst who reviewed Petitioner's renewal application testified that it was routine for the Board to obtain all filings from the Health Claims Arbitration Office and review renewal applications filed during the pendency of a Board investigation. The analyst further testified that information provided on renewal applications is verified through informa-

tion obtained from the Health Claims Arbitration Office. She became aware of the medical malpractice claim against Petitioner before he renewed his application, and the Health Claims Arbitration filing (in the Wagner case) was part of the Board's record prior to the investigation of the unrelated matter in 2006. The analyst also testified that she was prompted to review Petitioner's application after learning from the Assistant Attorney General for the Board that Petitioner would be in circuit court in December 2006. She then searched for Petitioner's name on the judiciary case information website.

Petitioner testified that he attended medical school in Korea and then came to the United States in 1973. He completed a three-year residency, in English, and received his Maryland license to practice medicine in 1977. He passed separate written and oral exams, both administered in English, in 1983. He speaks English on a regular basis with his patients and colleagues. He added, though, that he has some difficulty understanding certain aspects of the English language, "especially legal or written."

Petitioner admitted that he had knowledge of the Wagner case since 2005, had met with his attorney, and was deposed in connection with that matter on November 9, 2005. Petitioner explained his responses to the questions on the license renewal application. Beginning with question 6(m), Petitioner testified that he did not intend to deceive the Board; rather, he had read "filing or settlement" as "filing *and* settlement" (emphasis added); moreover, because the Wagner case had not settled, he believed the correct response to question 6(m) was "no." As for question 13(f), Petitioner testified that he understood the question to pertain only to family or household members, not himself. Petitioner further testified that he failed to respond to questions 21 through 31 when he filed the application, and, when it was returned to him, his wife assisted him in completing the remainder of the application. Petitioner acknowledged that he signed the affirmation at the end of the renewal application.

Petitioner's license renewal application was admitted into evidence. Also admitted was Petitioner's application for renewal of privileges at Frederick Memorial Hospital, which predated his license renewal application and acknowledged the pending Wagner case.

The ALJ issued a Proposed Decision on November 29, 2007. The ALJ determined that Petitioner's conduct was unprofessional and occurred "in the practice of medicine," because the information withheld in the license renewal application involved the "delivery of patient care in those matters that led to the filing of a malpractice claim." The ALJ also found that Petitioner knew of the pending malpractice case and had a duty to disclose that information in the license renewal application. The ALJ reasoned that, because the Board relies on the information provided to assess physicians' fitness, the failure to disclose information regarding pending malpractice claims constitutes "serious misconduct that may involve substantial risk of harm to patients, and may diminish the standing of the medical profession as caregivers." The ALJ further concluded that the conduct was unprofessional because physicians are required to provide truthful information on renewal applications.

The ALJ also concluded that Petitioner acted willfully because he "intended to provide the false statements that he submitted to the Board, and that his acts were not accidental or inadvertent." The ALJ rejected Petitioner's argument that "willful" contains the element of bad motive or knowledge that the acts were unlawful. The ALJ further rejected Petitioner's testimony that he merely had misunderstood the question. In that regard, the ALJ concluded that Petitioner had practiced medicine in Maryland for thirty years, lived in the United States for approximately thirty-three years, completed a three-year residency, completed oral and written exams in English, conversed with both patients and colleagues in English, and completed approximately fifteen license renewal applications during his practice. The ALJ recommended that Petitioner be reprimanded, fined $5,000, and be required to take an ethics course.

The Board heard Petitioner's exceptions to the ALJ's proposed order on February 27, 2008. The Board's Final Decision and Order adopted the majority of the ALJ's findings of fact [3] as well as the ALJ's conclusions of law that Petitioner had acted "in the practice of medicine" and "willfully." As sanctions, the Board placed Petitioner on six months' probation, fined him $5,000, and required him to complete an ethics course.

## Judicial Review

Petitioner filed a Petition for Judicial Review in the Circuit Court for Frederick County, Maryland. Petitioner raised the following claims of error: (1) the ALJ erred in denying the motion to dismiss the charges on the ground that they stemmed from a violation of COMAR 10.32.02.03.C(7)(d); (2) the ALJ erred in concluding that "the act of filing an application for renewal of a license constitutes the practice of medicine"; (3) "the ALJ erred in concluding that a 'false report in the practice of medicine' includes an application for renewal of a license, when no such interpretation has been made by statute or case law"; (4) the ALJ erred in finding that Petitioner willfully made a false representation in the renewal application; and (5) the ALJ erred in declining to dismiss the charges, for lack of substantial evidence. Following a hearing on the petition, the Circuit Court affirmed the Board's decision in a written opinion.[4]

Petitioner noted an appeal to the Court of Special of Appeals, which also affirmed the Board's decision. *Kim v. Md. State Bd. of Physicians*, 196 Md.App. 362, 367, 9 A.3d 534, 537 (2010). That court held, with regard to the Board's use of

---

**3.** The Board rejected, as irrelevant to the charges at hand, the ALJ's findings of fact concerning whether Petitioner had failed to disclose other medical malpractice cases.

**4.** We need not detail the ruling of the Circuit Court, because, in judicial review actions of final decisions of administrative agencies, we "look through" the decisions of the lower courts and review the final decision of the Board. *See People's Counsel for Baltimore County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007).

Petitioner's counsel's statement made during the scheduling of the CRC, that COMAR 10.32.02.03.C(7) did not apply because the statement was not substantive in nature. *Id.* at 372, 9 A.3d at 540. The Court of Special Appeals reasoned that, even if the regulation applied, the regulation's specific exemption for information available from other sources would permit its use nevertheless. *Id.* at 372–73, 9 A.3d at 540.

The Court of Special Appeals held that the Board did not err in deciding that Petitioner violated § 14–404(a)(3). The court reasoned that Petitioner's conduct "was sufficiently intertwined with the 'effective delivery of patient care' " to be deemed "in the practice of medicine" because non-disclosure of pending malpractice cases on an application for license renewal interferes with the Board's ability to investigate. *Id.* at 377, 9 A.3d at 543. In so holding, the intermediate appellate court looked to *Cornfeld v. State Board of Physicians,* 174 Md.App. 456, 921 A.2d 893, *cert. denied,* 400 Md. 647, 929 A.2d 890 (2007). There, the court, relying in part on the Board's interpretation of the statute it administered, held that the physician was engaged "in the practice of medicine" when he lied to a peer review committee and the Board during their respective investigations of his conduct during a patient's surgery. *Kim,* 196 Md.App. at 377–78, 9 A.3d at 542–43.

The Court of Special Appeals further held that there was substantial evidence to support the Board's decision that Petitioner's conduct was willful, for purposes of § 14–404(a)(11) and (36). 196 Md.App. at 382, 9 A.3d at 546. The intermediate appellate court rejected Petitioner's assertion that "willful" required the intent to deceive. *Id.* at 379, 9 A.3d at 544. That court affirmed the Board's findings that Petitioner had knowledge of the Wagner case and intended to provide his responses on the application. *Id.* at 380, 9 A.3d at 545.

We granted Petitioner's petition for writ of certiorari to answer three questions, which Petitioner frames as follows:

1. An Assistant Attorney General for the [Board] used statements made by counsel for Dr. Kim concerning a Case Resolution Conference (CRC) to bring this action against

Dr. Kim. Should the [Board] be permitted to use information obtained through the CRC process to bring a new action against a physician?

2. The [Board] charged Dr. Kim with "unprofessional conduct in the practice of medicine" and with willfully making or filing "a false report or record in the practice of medicine." Is completing a renewal application for a physician's license acting "in the practice of medicine?"

3. The [Board] also charged Dr. Kim with "willfully" making false representations when making application for licensure to practice medicine. Dr. Kim's testimony clearly indicated that he has difficulty with English. Should the [Board] be permitted to charge and punish a physician for "willfully" making false representations, when the physician did not understand the questions posed?

## II.

■■■■ "It is well settled that the State Judiciary's role in reviewing an administrative agency's adjudicatory decision is limited; it 'is limited to determining . . . if the administrative decision is premised upon an erroneous conclusion of law.'" *Finucan v. Md. Bd. of Physician Quality Assurance,* 380 Md. 577, 590, 846 A.2d 377, 384–85 (2004) (quoting *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994)) (citation omitted). "[A]n administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Md. Aviation Admin. v. Noland,* 386 Md. 556, 572, 873 A.2d 1145, 1154 (2005) (quoting *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1991)). "Despite the deference, 'it is always within our prerogative to determine whether an agency's conclusions of law are correct.'" *Adventist Health Care, Inc. v. Md. Health Care Comm'n,* 392 Md. 103, 121, 896 A.2d 320, 331 (2006) (quoting *Kushell v. Dep't of Natural Res.,* 385 Md. 563, 576, 870 A.2d 186, 193 (2005)).

 The court's review of the administrative agency's factual findings "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions." *Finucan*, 380 Md. at 590, 846 A.2d at 384–85 (quoting *United Parcel Serv.*, 336 Md. at 577, 650 A.2d at 230) (internal quotation mark omitted). We uphold the agency's factual conclusion if "a reasoning mind could have reached" that conclusion. *Banks*, 354 Md. at 68, 729 A.2d at 380 (quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978)) (internal quotation marks omitted). We

defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court 'must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.'

*Id.*, 729 A.2d at 380–81 (quoting *CBS v. Comptroller*, 319 Md. 687, 698, 575 A.2d 324, 329 (1990)) (alterations in original) (citation omitted).

It is through this limited judicial-review prism that we address Petitioner's questions.

### A. *Use of publicly available information to institute proceedings*

 Petitioner claims that the Board ran afoul of COMAR 10.32.02.03.C(7)(d) by using information obtained through the CRC process to investigate and ultimately press the charges against him in the present case. To repeat, that regulation provides: "Except for consideration of a proposed resolution of a case achieved through the CRC, the Board may not make later use of any commentary, admissions, facts revealed, or positions taken, *unless the subject matter is available from other sources or is otherwise discovered.*" (Emphasis added). Petitioner asserts that the regulation prohibits the Board from using information acquired from a statement Petitioner's counsel made to the Board's counsel, while the two were attempt-

ing to schedule an unrelated CRC, that Petitioner would be "in court" on the date proposed. Petitioner further asserts that the Board's position violates public policy because it discourages candor during the CRC process.

The Board counters that the statement does not come within the protection of confidentiality afforded by the regulation because the statement was not made during a CRC and was not substantive. The Board further argues that Petitioner's interpretation of the scope of the confidentiality protection ignores the plain meaning of the regulation, and "the Board did not actually attempt to use the statement . . . in any subsequent proceeding."

Reviewing courts are to accord some deference to an agency's interpretation of its own regulations, *Noland*, 386 Md. at 573 n. 3, 873 A.2d at 1155 n. 3, and we shall do so here. We, like our colleagues on the Court of Special Appeals, *see Kim*, 196 Md.App. at 372, 9 A.3d at 540, find no error in the Board's decision that COMAR 10.32.02.03.C(7)(d) does not include within its protection of confidentiality statements concerning the mere logistics attendant to a CRC. Indeed, Petitioner's contrary view of the regulation does not comport with a common sense interpretation of its plain language. That is to say, a statement relating solely to the scheduling of a CRC is not "commentary," an "admission[ ]," a "fact[ ] revealed," or a "position[ ] taken" at a CRC. COMAR 10.32.02.03.C(7)(d).

 We likewise find no error in the Board's additional rationale that the statement that Petitioner was "in court" falls within the regulation's exception to the confidentiality protection for information that "is available from other sources or is otherwise discovered." Neither do we find fault, as Petitioner would have us do, with the Board's finding additional support for that conclusion in *Attorney Grievance Commission v. Lee*, 387 Md. 89, 874 A.2d 897 (2005). In *Lee*, an attorney under disciplinary review had attempted to use, for impeachment purposes, a witness's statement allegedly made during a confidential peer review proceeding, *id.* at 103, 874 A.2d at 905, despite Maryland Rule 16–723(a), which prohibits

such use in proceedings subsequent to the peer review, *id.* at 110, 874 A.2d at 911. We pointed out that, although "what happens in Peer Review stays in Peer Review," a party nevertheless has an opportunity to discover information through other avenues and to use that information discovered independently. *Id.* at 113–14, 874 A.2d at 911–12. *See also* Md. Rule 17–109(e) (providing for confidentiality of communications during mediation proceedings, but not protecting information from disclosure "solely by reason of its use in mediation").

Like Maryland Rules 16–723(a) and 17–109(e), COMAR 10.32.02.03.C(7)(d), by its plain language, allows for the use of information that, even though obtained *during* a CRC, is "available from other sources." There was substantial evidence in the present case not only that the information that Petitioner would be "in court" on a certain date was available from the Health Claims Arbitrations Office and the Maryland Judiciary Case Search, but also that the Board actually acquired the malpractice case information from those other sources.

It follows that the Board committed no error in its construction of COMAR 10.32.02.03.C(7)(d). Moreover, substantial evidence in the record supports the Board's application of that regulation to Petitioner's case.

### B. *"In the practice of medicine"*

▇▇▇ Petitioner challenges the Board's conclusion that the filing of his application for renewal of his license occurred "in the practice of medicine." He asserts that the conduct is not within the purview of the statutory definition.[5] He argues

---

5. Section 14–101(n) (2010 Supp.) provides:

(n) Practice medicine.—(1) "Practice medicine" means to engage, with or without compensation, in medical:
 (i) Diagnosis;
 (ii) Healing;
 (iii) Treatment; or
 (iv) Surgery.

that there is a legally insufficient relationship between the statutory definition of "practice" and Petitioner's conduct, the relationship being that submitting false statements impedes the Board's ability to "make informed decisions regarding physician qualifications and adequately safeguard the public health." The deficiency, Petitioner asserts, rests in the fact that the Health Claims Arbitration Office alerts the Board to all claims filed, pursuant to Maryland Code (1974, 2006 Repl. Vol.), § 3–2A–04(b)(6) of the Courts & Judicial Proceedings Article.[6] Therefore, according to Petitioner, the non-disclosure of malpractice matters in fact does not impede the Board's functioning.

The Board counters that we, as well as the Court of Special Appeals, have rejected a narrow interpretation of the term "in the practice of medicine." The Board adds that its interpretation of what constitutes "practice of medicine" is entitled to deference.

We first examined the breadth of conduct falling within the meaning of "in the practice of medicine," in *McDonnell v. Commission on Medical Discipline*, 301 Md. 426, 483 A.2d 76

---

(2) "Practice medicine" includes doing, undertaking, professing to do, and attempting any of the following:

(i) Diagnosing, healing, treating, preventing, prescribing for, or removing any physical, mental, or emotional ailment or supposed ailment of an individual:

1. By physical, mental, emotional, or other process that is exercised or invoked by the practitioner, the patient, or both; or
2. By appliance, test, drug, operation, or treatment;

(ii) Ending of a human pregnancy; and

(iii) Performing acupuncture as provided under § 14–504 of this title.

(3) "Practice medicine" does not include:

(i) Selling any nonprescription drug or medicine;

(ii) Practicing as an optician; or

(iii) Performing a massage or other manipulation by hand, but by no other means.

6. Maryland Code (1974, 2006 Repl. Vol.), § 3–2A–04(b)(6) of the Courts & Judicial Proceedings Article provides: "In the case of a claim or action against a physician, the Director shall forward copies of the certificates filed under paragraphs (1) and (2) of this subsection to the State Board of Physicians."

(1984). In *McDonnell,* we considered whether a physician's attempt to intimidate adverse expert witnesses in a medical malpractice case was conduct that comes within the meaning of "in his practice as a physician." [7] *Id.* at 428, 483 A.2d at 76. Physician McDonnell, concerned that the experts were inexperienced, communicated with them directly and threatened to have transcripts of their depositions disseminated to the local and national medical communities. *Id.,* 483 A.2d at 76–77. The experts testified against McDonnell, despite his intimidation. *Id.* at 429, 483 A.2d at 77. After the trial concluded, McDonnell was reprimanded for "immoral conduct of a physician in his practice as a physician." *Id.* at 429–30, 483 A.2d at 78.

Before this Court, McDonnell admitted the impropriety of his actions, but asserted that those actions did not occur "in his practice as a physician." *Id.* at 433, 483 A.2d at 79. We concluded that, although McDonnell's conduct was improper, it was not sanctionable, *id.* at 434, 483 A.2d at 80, because it was "clear that the legislature did not intend that a physician's general moral character would be subject to sanction," *id.* at 436, 483 A.2d at 81. We rejected the argument that the statute extended to "immoral conduct simply because, in some manner, it had a general or associative relationship to the physician in his capacity as a member of the medical profession." *Id.* at 436, 483 A.2d at 81. Instead, we held that sanctionable conduct must be "directly tied to the physician's conduct in the actual performance of the practice of medicine, i.e., in the diagnosis, care, or treatment of patients." *Id.* at 437, 483 A.2d at 81.

---

7. At the time we decided *McDonnell v. Commission on Medical Discipline,* 301 Md. 426, 428, 483 A.2d 76, 76 (1984), the statute reprimanded "[i]mmoral conduct of a physician in *his practice as a physician."* (quoting Md.Code (1957, 1980 Repl. Vol.), Article 43, § 130(h)(8)) (alteration in original) (emphasis added). The change in phraseology does not affect the applicability of our reasoning in that case to issues arising under the recodified statute, which allows for reprimand of unprofessional or immoral conduct "in the practice of medicine." § 14–404(a)(3); *see McDonnell,* 301 Md. at 435, n. 4, 483 A.2d at 80, n. 4.

Not surprisingly, Petitioner relies on *McDonnell* as support for a narrow interpretation of the statute. *McDonnell*, however, does not stand for the general proposition Petitioner advances. Moreover, *McDonnell* is not the last word on the subject.

We have consistently recognized that "in the practice of medicine" applies not only to diagnosing and treating patients, but also to "misconduct relat[ing] to the effective delivery of patient care." *Finucan*, 380 Md. at 597, 846 A.2d at 389. In *Finucan*, we held that a physician's engaging in sexual relationships with patients occurred "in the practice of medicine" because his behavior went "to the heart of his duties as their family doctor." *Id.* at 599–600, 846 A.2d at 390–91. Similarly, in *Banks* we held that a physician's engaging in a pattern of sexually harassing hospital employees, 354 Md. at 76–77, 729 A.2d at 385, was "in the practice of medicine" because his on-duty conduct negatively affected the working environment, which needed "at all times" to "be conducive to the practice of medicine," and "his conduct was a threat to the teamwork approach of health care," *id.* at 75, 729 A.2d at 384.

Likewise, in *Cornfeld*, the Court of Special Appeals, applying the reasoning of *Banks* and *Finucan*, held that conduct similar to Petitioner's occurs "in the practice of medicine." 174 Md.App. at 473–79, 921 A.2d at 903–07. The physician, Cornfeld, while being investigated about his conduct during a surgery he had performed, made false statements at both the hospital peer review stage of the investigation and during the Board's subsequent investigation and disciplinary proceedings. *Id.* at 467, 921 A.2d at 899. The court affirmed the Board's determination that Cornfeld's misconduct occurred "in the practice of medicine" because peer review proceedings "serve[ ] an important patient care purpose." *Id.* at 479–80, 921 A.2d at 906–07. Moreover, Cornfeld's false statements related to instructions he had given to others in rendering surgical care; consequently, his conduct was directly related to medical "treatment" and "surgery," within the statutory definition of "practice medicine." *Id.* at 481, 921 A.2d at 907. In so holding, the Court of Special Appeals recognized that a

sufficient relationship between conduct and patient care can be established by showing "that the physician abused his status as a physician in a manner that either harmed patients, created a substantial risk of harm to them, or diminished the standing of the medical profession as caregivers." 174 Md. App. at 477–78, 921 A.2d at 905–06.

In the present case, the Board made no legal error in concluding that Petitioner's submission of his license renewal application occurred "in the practice of medicine." We made plain in *Banks* that, in "considering whether a physician's conduct was within the statutory requirement of 'in the practice of medicine,' a critical factor has been whether the conduct occurred while the physician was performing a task integral to his or her medical practice." 354 Md. at 74, 729 A.2d at 384. Petitioner's completion and filing of his application to renew his physician's license is unquestionably "a task integral to his ... practice." Without a license, Petitioner would have no authority to practice.

Moreover, the Board did not err in adopting the ALJ's finding that filing a license renewal application is sufficiently intertwined with patient care. We appreciate that the Board must be able to rely on the accuracy of information conveyed in license applications in order to investigate and determine physicians' fitness to practice medicine. A physician's submission of false information regarding malpractice claims in license renewal applications impedes the Board's ability to make accurate determinations about a physician's continued fitness. Although, at best, false information might merely delay investigation, at worst, false information could form the basis upon which the Board renews or grants a license, potentially to an unfit applicant. The Board is entitled to expect truthful submissions, particularly with respect to information concerning suits for malpractice, given that such suits directly raise questions regarding a physician's fitness to practice.

Petitioner argues that his falsehood in connection with the pending Wagner case is ultimately immaterial to the Board's

licensing decision, because the Board has independent means of investigating whether a physician has been involved in any malpractice litigation through the Maryland Judiciary Case Search, and the Board receives malpractice filing information pursuant to statute from the Health Claims Arbitration Office. The argument is meritless. "The purpose of disciplinary proceedings against licensed professionals is not to punish the offender but rather as a catharsis for the profession and a prophylactic for the public." *McDonnell,* 301 Md. at 436, 483 A.2d at 81. It is of no consequence that the Board would otherwise discover the lie, or, for that matter, that no patient was harmed by the physician who undertakes to lie about a malpractice claim.

Giving to the Board the deference to which it is entitled in the interpretation and application of § 14–404, we cannot say that the Board erred in concluding that Petitioner's falsehood concerning the pendency of the Wagner malpractice case was conduct "in the practice of medicine."

## C. *Willful conduct*

Two of the three § 14–404 provisions that the Board concluded Petitioner had violated (i.e., § 14–404(a)(11) and (36)) require a finding that Petitioner acted "willfully." Petitioner asserts that inclusion of the term "willfully" in those provisions required the Board to prove that he knew his statements were false and "intended to deceive the Board by inducing it to act to its detriment by renewing his license." Petitioner, pursuant to that understanding of the term, adds that there was legally insufficient evidence to prove that he acted willfully in failing to disclose the pending Wagner case. To the contrary, he asserts, any suggestion of willfulness is belied by the evidence (1) of his demonstrated English language limitations and (2) that he disclosed the pending malpractice action on his previously filed hospital privileges renewal application.

The Board counters that "willful" does not require the intent to deceive, but rather only that the act be "purposeful conduct, which requires neither a bad motive nor knowing

unlawfulness." (citing *Deibler v. State*, 365 Md. 185, 199, 776 A.2d 657, 665 (2001)). The Board further asserts that the ALJ's factual findings were supported by substantial evidence because Petitioner admitted that he was aware of the pending case when he filed his application, yet he nevertheless indicated on his license renewal application that there were no malpractice claims pending against him.

The ALJ's decision, adopted by the Board's Final Decision and Order, relied on the definition of "willful" endorsed by this Court in *Deibler*, 365 Md. 185, 776 A.2d 657. In that case, we considered the meaning of "willful" under the Maryland criminal wiretap statute and discussed four distinct definitions of the term. *Id.* at 192–93, 776 A.2d at 661. We explained:

> "[W]illful" has received four different constructions from the courts. The first, and most restrictive, is that an act is willful only if it is done with a bad purpose or evil motive— deliberately to violate the law. A second interpretation considers an act to be willful "if it is done with an intent to commit the act and with a knowledge that the act is in violation of the law." That construction does not require that the defendant possess a sinister motivation, but, like the first interpretation, it does require knowledge that the act is unlawful. The third interpretation "requires only that the act be committed voluntarily and intentionally as opposed to one that is committed through inadvertence, accident, or ordinary negligence." Under that approach, "[a]s long as there is an intent to commit the act, there can be a finding of willfulness even though the actor was consciously attempting to comply with the law and was acting with the good faith belief that the action was lawful." What is required is "an objective intent to commit the act but not necessarily a knowledge that the act will bring about the illegal result." Finally . . . some courts have gone so far as to find an act willful even though it was not committed intentionally, but through oversight, inadvertence, or negligence.

*Id.*, 776 A.2d at 661 (quoting S. Brogan, *An Analysis of the Term "Willful" in Federal Criminal Statutes*, 51 Notre Dame

Lawyer 786 (1976)) (second alteration in original) (internal citations omitted). We concluded that most applications of "willful," if not all, fell within the third definition: a willful act is committed voluntarily and intentionally, not necessarily with the intent to deceive. *Id.* at 195, 776 A.2d at 663.

The ALJ correctly recognized (and, by its adoption of the ALJ's findings and conclusions, so too did the Board), that we have rejected the conclusion that "willful" means that a person acts with a deceitful or fraudulent motive, in the context of attorney grievance proceedings. *See, e.g., Att'y Grievance Comm'n v. Jarosinski,* 411 Md. 432, 451, 983 A.2d 477, 488–89 (2009) (stating that, "[i]n the context of attorney grievance matters, willfulness is defined as 'the voluntary, intentional violation of a known legal duty not requiring a deceitful or fraudulent motive.' A hearing judge need not have evidence of a deceitful or fraudulent motive to conclude that an attorney's conduct was willful" and concluding that the attorney willfully misappropriated client trust funds (quoting *Att'y Grievance Comm'n v. Nussbaum,* 401 Md. 612, 636, 934 A.2d 1, 15 (2007) (internal citation omitted))).

Similarly, the Court of Special Appeals has defined "willful" as "intentional, or knowing, or voluntary, as distinguished from accidental," in the context of civil litigation. *See Bond v. PolyCycle, Inc.,* 127 Md.App. 365, 381, 382, 732 A.2d 970, 978 (1999) (concluding that appellant acted willfully in deleting files from computers even though he "believed that he was entitled to take the technology") (quoting *Pac. Mortg. and Inv. Grp., Ltd. v. Horn,* 100 Md.App. 311, 332–33, 641 A.2d 913, 923 (1994)). The intermediate appellate court has concluded also that this definition is not erroneous in other administrative contexts. *See Bereano v. State Ethics Comm'n,* 174 Md.App. 146, 162, 176–77, 920 A.2d 1137, 1146, 1155 (2007), *reversed on other grounds and remanded,* 403 Md. 716, 756–57, 944 A.2d 538, 561–62 (2008) (adopting the Commission's definition of "knowin[g] and willfu[l]" as "intentional, or knowing, or voluntary as distinguished from accidental" (internal quotation marks omitted)).

Despite the broad support in Maryland caselaw for the definition of "willfulness" that the Board employed in applying § 14–404, Petitioner insists that, "[t]o establish a prima facie case for 'willfully making a false representation' to obtain a license or renewal of a license[,] the State must prove . . . that [Petitioner] intended to deceive the [Board] by inducing it to act to its detriment." For support of that notion, Petitioner cites *Maryland Board of Physicians v. Elliott*, 170 Md.App. 369, 907 A.2d 321, *cert. denied*, 396 Md. 12, 912 A.2d 648 (2006). Petitioner's reliance on *Elliott* is misplaced.

Elliot was charged with obtaining his license "fraudulently or deceptively"; "unprofessional conduct in the practice of medicine"; and "willfully mak[ing] a false representation when seeking or making application for licensure." *Id.* at 403, 907 A.2d at 341. The Board concluded that Elliot had obtained his license by fraud or deceit; the Board therefore found it unnecessary to render a decision on the two latter charges. *Id.*, 907 A.2d at 341. Nothing in *Elliott* remotely suggests that "willfully" requires an independent showing of intent to deceive or fraud.

In short, granting to the Board the deference it is due in interpreting the statute, we hold that the Board did not erroneously interpret "willful" in the context of § 14–404. "Willful," for purposes of § 14–404, requires proof that the conduct at issue was done intentionally, not that it was committed with the intent to deceive or with malice.[8]

■■■■ Applying that definition of willfulness to Petitioner's case, we conclude that there was substantial evidence that he acted willfully in making a false statement on his application for renewal of his medical license. In fact, Petitioner's testimony supported the ALJ's credibility determination that Petitioner's explanation of misunderstanding and inadvertence was

---

**8.** Because we conclude that "willful" only requires the intent to commit the act, we need not examine the Board's adoption of the ALJ's alternative reasoning, i.e., that Petitioner's conduct was willful because "he acted with reckless disregard for the truth and his legal obligations."

"illogical and unconvincing." Petitioner testified that he understood the difference between "and" and "or." He also testified to his extensive professional experience in the United States that he has conducted in English.

Petitioner nevertheless argues to us that his English language limitations were evident in the transcript of the proceedings. But it is not our role to reevaluate the evidence presented to the administrative agency or to make credibility determinations anew. *Banks*, 354 Md. at 68, 729 A.2d at 380–81. The ALJ found that Petitioner came to the United States over thirty years ago, "completed a three year residency in English," "took oral and written tests for Board certification in English," and "speaks English in his medical practice, both in treating patients and speaking with colleagues." From those first-level findings the ALJ made the ultimate factual findings that "[Petitioner] intended to provide the false statements that he submitted in his license renewal application and that his responses were not accidental or inadvertent." The Board accepted the ALJ's findings in determining for itself that Petitioner "willfully ma[de] or file[d] a false report or record in the practice of medicine," under § 14–404(a)(11); and "willfully ma[de] a false representation [while] seeking or making application for licensure," under § 14–404(a)(36). The Board's decision is not premised on an erroneous conclusion of law and is supported by substantial evidence. We therefore uphold it.

### III.

In summary, we hold that: (1) the Board did not err in either its interpretation of COMAR 10.32.02.03.C(7)(d) or its application of that regulation to the statement of Petitioner's counsel that Petitioner would be "in court" on a date proposed to conduct an unrelated CRC; (2) the Board's decision that Petitioner violated § 14–404(a)(3), by failing to include on his application for a medical license the pendency of the Wagner malpractice action, was not based on an erroneous conclusion of law because Petitioner's false statement on the application comes within the meaning of "unprofessional conduct in the

**548**

practice of medicine"; and (3) the Board did not err in determining that the term "willful" means intentional, for purposes of § 14–404(a)(11) and (36), and the record contains substantial evidence that, in his application for license renewal, Petitioner willfully made false statements in connection with his involvement in a medical malpractice action.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY THE PETITIONER.**