51 A.3d 692

Adeline STURDIVANT, et al.

v.

MARYLAND DEPARTMENT OF HEALTH
AND MENTAL HYGIENE.

No. 309, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Aug. 31, 2012.

Joel Smith (David Gray Wright, Kahn, Smith & Collins PA, on the brief) Baltimore, MD, for appellant.

David R. Morgan (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., WRIGHT and KEHOE, JJ.

KEHOE, J.

The primary issue in this case is whether a State agency is required—as opposed to authorized—to fill vacant positions by reinstating laid-off State employees.

In 2009, the Maryland Department of Health and Mental Hygiene ("DHMH") closed the Rosewood Center, a facility that provided treatment services to developmentally disabled individuals, and transferred a number of its staff members to Spring Grove Hospital, a psychiatric hospital. As a result of the consolidation of the two facilities, a number of Spring Grove staff members were laid off,[1] including the 17 appellants in this case.[2] Some of the laid-off workers were then rehired. Asserting that they should have been included among the rehired staffers, appellants filed a grievance, which was denied by an administrative law judge. They then filed a petition for judicial review in the Circuit Court for Baltimore City. The court affirmed the ALJ's decision. Appellants present one issue which we have reworded and divided into two:

I.  After a layoff, do laid-off State employees have a statutory right to reinstatement by seniority if the unit seeks to fill vacancies in the same class?

II. Did Spring Grove Hospital fill the job vacancies in question by reinstating laid-off employees or by recruiting candidates and appointing the most qualified?

We conclude that Title 7 and 11 of the State Personnel and Pensions Article ("SPP") (1994, 2009 Repl.Vol.) gave Spring Grove two means of filling the vacancies in question: recruit-

---

**1.** The phrase "laid off" is used in the State Personnel and Pensions Article, as well as this opinion, as both a verb and a participle. In the Code, when used as a participle, the phrase is hyphenated but when used as a verb, it is not. We will follow this convention.

**2.** The appellants are Adeline Sturdivant, Brenda Myles, Karen Berry, Marcus Green, Rebecca Adepoju, Watchen Smith, Gerald Belt, Starnay Weaver, Cheryl Matthews, Peter Opoku, Vannetter Nowlin, Hattie Ingram, Angel Griffin, Terence Peeples, Isabella Camphor, Theresa Burgess and John Brown. Two of the original grievants, Janeen Butler and Tanya Carter, are no longer parties.

ment and reinstatement. Because there is no statutory preference for either method, we answer appellants' first question in the negative.

As to the second issue, if the agency decides to fill the vacancies through recruitment, it must follow the procedures mandated by the General Assembly in Title 7. These requirements are manifold but the most important in our view pertain to public notice, thus assuring that all interested individuals have an opportunity to apply, and transparency, so that applicants and would-be applicants will know what criteria will be used in making hiring decisions. The degree to which Spring Grove complied with these statutory mandates is problematic. The administrative law judge made findings of fact regarding some but not all of these compliance issues. We will remand this case to the administrative law judge for further proceedings.

For its part, DHMH advances an additional question, which we have also rephrased:

Did the ALJ err by permitting 17 additional grievants to join the original grievance petition, even though those grievants were no longer employed by DHMH?

This issue is not preserved for judicial review.

## BACKGROUND

We summarize some of the uncontested factual findings made by the ALJ as part of her decision.

### The Closure of Rosewood and Layoffs at Spring Grove

Direct Care Assistants ("DCAs") are responsible for assisting patients with their daily activities, escorting patients to and from appointments and performing similar direct services related to patient care. Prior to 2009, appellants were employed as DCAs at Spring Grove Hospital. In 2008, the State began to consolidate DHMH's long-term care facilities. The Rosewood Center was scheduled for permanent closure. As the Rosewood Center was in the process of shutting down, DHMH transferred employees from that facility to Spring

Grove Hospital. The first group of displaced Rosewood employees arrived at Spring Grove Hospital in January 2009. Successive groups of Rosewood employees followed in February, May, June, and July 2009.

In August 2009, DHMH employed approximately 176 DCAs at Spring Grove Hospital, all of whom occupied positions subject to the State Personnel Management System ("SPMS").[3]

In June and July 2009, after Rosewood closed, Spring Grove began to determine how many Rosewood employees arrived and how many employees would be laid off as a result.

For purposes of a layoff, an employer must compute the number of "seniority points" that each employee has accumulated while working for the State. SPP § 11–205(a). DCAs accumulate seniority points on account of their service record: one point for each month of State employment, one point for each month of employment in DHMH, and one point for each month of employment in the job series[4] in which the layoff will occur. *Id.*

DHMH calculated the seniority points of employees at Spring Grove Hospital. A list of the seniority points computations prepared by DHMH was forwarded to Dr. David Helsel, Spring Grove's Superintendent, who in turn shared it with Judy Tullius, Spring Grove's Personnel Director.

---

**3.** The State Personnel Management System ("SPMS") is established by SPP § 6–101 and consists of Division I (Titles 1 through 15) of the State Personnel and Pensions Article. SPP § 6–202(a). Personnel actions taken by agencies subject to the SPMS must be consistent with the provisions of Division I and "the regulations, guidelines, policies, and procedures adopted under it." *Id.* The SPMS is the "principal personnel system in the Executive Branch of State government." SPP § 2–202. The current version of the SPMS was enacted in 1996. *See Reier v. Dept. of Assessments and Taxation,* 397 Md. 2, 27–28, 915 A.2d 970 (2007).

**4.** " 'Job series' means a group of two or more classes in the same occupational area which requires the application of the same knowledge, skills, and abilities at varying levels of proficiency or responsibility, as determined by the Secretary." COMAR 17.04.04.01(B).

Spring Grove determined that approximately 50 Spring Grove DCAs needed to be laid off. Spring Grove identified the DCAs with the lowest seniority (fewest seniority points) based on the list of seniority points furnished by DHMH. Tullius prepared a form letter to send to each Spring Grove DCA scheduled to lose his or her job. All the identified DCAs were given the same letter and it was dated August 12, 2009. The letter stated:

It is with regret that I must inform you that you will be laid off effective Monday, October 12, 2009.

As you may be aware, you will receive the benefit of the application of COMAR 17.04.04.01, *which provides for layoff/displacement procedures based on seniority, and reinstatement procedures.* Please be advised that the Department has limited displacement to Baltimore County. Unfortunately, there are no employees in your classification who are less senior in Baltimore County displacement area. Therefore, you will be laid off. Your last day of employment will be Monday, October 12, 2009.

(Emphasis added).

### Rehiring Some of the Laid–Off DCAs

Enclosed with the August 12 layoff letter was an employment application. Tullius orally explained to affected DCAs that they needed "to fill out the application, get it back to [her] as quickly as possible, [and] that [Spring Grove was] working on trying to identify positions to go ahead and recruit." Most of the laid-off DCAs, including all of the appellants, filed an employment application for their previous positions.

At the direction of Tullius, Angela Hayes, Spring Grove's Nurse Recruiter, organized a committee to interview DCAs who applied for the open positions. The interview panel was assigned to determine who among the applicants would be best qualified to fill the vacancies. The interview panel conducted interviews on August 26, 27, and 28, 2009. Spring Grove also reviewed the personnel file of all employees who

applied. It noted the amount of sick leave each DCA used and the number of disciplinary actions received by each DCA.

The interview panel presented each DCA with a list of ten questions. Each of the four panelists graded the response given to each of the ten questions based on a four level score: "Best–Better–Good–Fair." The scripted questions included:

1. "How can [Spring Grove] be assured that you will come to work?"

2. "Give some examples of how the hospital can depend on you."

3. "Considering that you are laid-off, give examples as to why you would like to remain employed here at [Spring Grove]?"

4. "How can you help to decrease patient-to-patient or patient-to-staff assault?"

The scored result of each interview, along with the result of the personnel file review, were summarized on a document prepared by Hayes entitled the "Interview Process" table. Based on this information, the director of nursing at Spring Grove determined which employees would be offered DCA positions. Tullius extended offers of employment to approximately 22 DCAs. The offers of employment and rejection letters were issued by letter dated September 16, 2009.

Laid-off DCAs who were junior in seniority points to appellants were offered employment as DCAs, and subsequently employed by Spring Grove on October 13, 2009.

### The Grievance

The September 16th letters did not mention seniority points and appellants soon realized that seniority had not been honored. On October 2, 2009, the American Federation of State, County, and Municipal Employees, Council 982 ("AFSCME"), the bargaining representative for DCAs and other employees of DHMH, filed a grievance with DHMH, signed by Ms. Sturdivant and Mr. Opoku. The grievance identified the employees as "Peter Opoku; Adeline Sturdivant, et al." and asserted:

DHMH and its Spring Grove Hospital took action and initiated the process to lay off employees and to conduct "rehiring interviews" with certain employees in disregard of employees' seniority rights as mandated by applicable statutes.

Management initiated the lay off process in spite of the fact that approximately 30 [5] vacancies in the same classification from which employees are being laid off existed at the time. Further, Management is also failing to follow procedures stated in statutes and regulations for the reinstatement of separated employees due to abolition of positions mandated by the State Governor and the Board of Public Works.

Shortly after the grievance was filed, AFSCME's representatives met with officials of DHMH and the Department of Budget and Management ("DBM") to identify which laid-off DCAs would be eligible to join in the grievance and to discuss the layoff and rehiring process. One result of the discussions was an agreement between the Director of DBM's Employee Relations Division and an AFSCME representative that AFSCME would have until April 15, 2010 to identify laid-off DCAs who wished to participate in the grievance proceedings. AFSCME identified seventeen additional grievants who were consolidated with the original October 2, 2009 grievance. Pursuant to SPP §§ 12–201–12–205, the grievants and DHMH attempted to resolve their dispute first within that department and then by an appeal to the Secretary of the DBM. Those efforts failing, the Secretary referred the grievance to the Office of Administrative Hearings for an adjudicatory hearing before an administrative law judge. The ALJ's decision is DBM's final decision. *See* SPP § 12–205(c)(2)(ii).

After an evidentiary hearing, the ALJ issued a 32 page decision denying the grievance. Appellants filed a petition for judicial review. On April 18, 2011, the circuit court issued an

---

5. This figure is inaccurate. Approximately 14 DCA vacancies existed at that time. Ultimately, 21 vacancies were identified and filled by Spring Grove management on October 13, 2009.

order affirming the ALJ's decision. Appellants filed a notice of appeal.

## STANDARD OF REVIEW

This case involves a judicial review of a decision issued by a State administrative agency. In such a case, "we review directly the action of the agency, rather than the decision of the intervening reviewing courts." *Md. Ins. Comm'r v. Cent. Acceptance Corp.*, 424 Md. 1, 14, 33 A.3d 949 (2011). Our "review of the administrative agency's factual findings is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions." *Kim v. Md. State Bd. of Physicians*, 423 Md. 523, 536, 32 A.3d 30 (2011) (quotation marks and citation omitted). "We uphold the agency's factual conclusion if a reasoning mind could have reached that conclusion." *Id.*

In contrast, we review an administrative agency's conclusions of law *de novo*. *Schwartz v. Md. Dep't of Natural Res.*, 385 Md. 534, 554, 870 A.2d 168 (2005) ("[I]t is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong.").

"When considering a question of statutory interpretation by an agency, we review the agency's interpretation according to a non-deferential standard of review." *Acceptance Corp.*, 424 Md. at 16, 33 A.3d 949.

## DISCUSSION

There are three issues before us in this appeal. First, we must determine whether the ALJ erred when she concluded that SPP § 11–208 does not establish a right of reinstatement for laid-off State employees. Second, we must address whether DHMH complied with Title 7 of the State Personnel and Pensions Article when it conducted its hiring process. Finally, we will discuss DHMH's contention that the ALJ erred in permitting 17 former employees to participate in the grievance.

## I. A Right to Reinstatement?

At the heart of the parties' dispute is SPP § 11–208, which states:

§ **11–208. Order of reinstatements.**

(a) *Within same class.*—The employee with the most seniority points shall be the first employee to be reinstated in the class from which the employee was laid off or from which the employee was separated under § 11–302 [6] of this title or to any lower class in the same job series within the principal department or other independent unit in which the layoff or separation under § 11–302 of this title occurred.

(b) *Within comparable class.*—Reinstatement to a comparable class to which the Secretary has certified employees who were laid-off or who were separated under § 11–302 of this title shall be made from among the five laid-off or separated employees with the most seniority points who are certified to the class.

In her analysis, the ALJ concluded that SPP § 11–208 does not give laid-off workers a statutory right of reinstatement. She reasoned that:

If the Legislature intended to require the appointing authority to give laid off employees priority over others for vacant State positions, it would have enacted language … imposing such a requirement on appointing authorities. It did not do so, however, so I cannot impose that obligation on Spring Grove.

Appellants contend that, although Spring Grove was not required to fill its vacant DCA positions, when the hospital decided to do so, it was required by SPP § 11–208(a) and COMAR 17.04.04.05(C) [7] to reinstate the laid-off DCAs by

---

**6.** An employee is "separated" when his or her job position is eliminated for budgetary reasons. *See* SPP § 11–302.

**7.** The regulation provides, in relevant part (emphasis added):

COMAR 17.04.04.05 Reinstatement.

seniority. In their view, the ALJ erred as a matter of law when she concluded otherwise. DHMH's position is that the ALJ's legal analysis was correct.

Whether SPP § 11–208(a) establishes a right of reinstatement is a matter of statutory construction. This Court recently summarized the appropriate judicial approach to these questions in *Powell v. Breslin,* 195 Md.App. 340, 351–53, 6 A.3d 360 (2010), *affirmed,* 421 Md. 266, 299, 26 A.3d 878 (2011):

> The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature.
>
> [T]o determine [the legislative] purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. . . . If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, [w]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in th[e] language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends. . . .

\*     \*     \*

A. State Personnel and Pensions Article, §§ 2–601, 2–701–2–707, 7–208, 7–402, 7–701, 11–109, 11–208, and 11–304, Annotated Code of Maryland, and the regulations in this chapter, govern reinstatement.

\*     \*     \*

C. *With the exception of an employee under special appointment,*[\*] *the following is the order of reinstatement priority for an employee in the skilled and the professional services:*

(1) A returning veteran or reservist entitled to reinstatement under State Personnel and Pensions Article, Title 2, Subtitle 7, Annotated Code of Maryland;

(2) *An individual who has been laid off or whose position has been abolished;*

\* "Employee[s] under special appointment" are policy-making and similar officials appointed by the Governor, the Board of Public Works or the secretary of a State department. *See* SPP § 6–405. DCAs are not special appointees.

In addition, the meaning of the plainest language is
controlled by the context in which it appears. As this Court
has stated, [b]ecause it is part of the context, related
statutes or a statutory scheme that fairly bears on the
fundamental issue of legislative purpose or goal must also
be considered. Thus, not only are we required to interpret
the statute as a whole, but, if appropriate, in the context of
the entire statutory scheme of which it is a part.

(Internal quotation marks and citations omitted). We turn to
the statutes.

### Overview

Title 7 sets out the procedures for "fill[ing] vacant skilled
service and professional service positions" in the SPMS. SPP
§ 7–201(b). An appointing authority [8] may fill job vacancies in
one of three ways. As outlined in SPP § 7–203:

An appointing authority may select candidates for a posi-
tion:

(1) from an existing list of eligible candidates;

(2) if the appointing authority decides to recruit for the
position, by recruitment; or

(3) from a special list of eligible candidates whom the
Division of Rehabilitation Services of the Department of
Education certifies as being physically capable and ade-
quately trained to qualify for the position.

In this case, neither party contends that subsection (3)
applies to the facts before us. The only relevant options
under Title 7 are SPP § 7–203(1) and (2), which allow an
appointing authority to select candidates for a position either
from an existing list of eligible candidates or by recruitment.

---

8. " 'Appointing authority' means an individual or a unit of government
that has the power to make appointments and terminate employment."
SPP § 1–101(b). The appointing authority for Spring Grove Hospital is
its superintendent. *See* MD.CODE ANN. HEALTH-GEN. § 10–408(d)(2)
(1982, 2009 Repl.Vol.) (each superintendent of a State hospital shall
"[i]n accordance with the provisions of the State Personnel and Pen-
sions Article, appoint a staff for the State facility as needed and as
provided in the State budget. . . .").

Title 11 addresses, *inter alia,* "(1) the *layoff* of employees in the skilled service or the professional service; and (2) the *reinstatement* of laid-off and separated skilled service or professional service employees to comparable positions in State employment." SPP § 11–202 (emphasis added). When an agency seeks to fill vacant job positions by reinstatement, Title 11 provides that positions are filled according to seniority, where "[t]he employee with the most seniority points [is] the first employee to be reinstated...." SPP § 11–208(a). Title 11 operates in concert with Title 7. Laid-off employees eligible for reinstatement form "an existing list of eligible candidates" within the purview of SPP § 7–203(1).

Appellants assert that, under § 11–208(a), if there is a list of eligible candidates and that list includes, or consists entirely of, laid-off employees, the appointing authority must rehire the laid-off employees by seniority before considering any other candidate. We are not persuaded by appellants' contention. Before addressing this matter, we will provide a more detailed explanation of the two hiring schemes relevant to this appeal.

### Title 7, Subtitle 2: Appointments

Title 7 sets out a detailed scheme that an appointing authority must follow when it chooses to fill a vacant position. The process begins, conceptually, with a description of the position to be filled. Under SPP § 7–102(a)(1), "[e]ach employee ... shall be provided with a written position description which describes the essential duties and responsibilities the employee is expected to perform and the standards for satisfactory performance on a form approved by the Secretary [of DBM]." The position description must be approved by the appointing authority. SPP § 7–102(b). Supervisors are obligated to "give each supervised employee a copy of the position description for the employee's position." SPP § 7–102(c)(1)(iii).

### Position Selection Plans

While the written position description can serve other pur-

poses,[9] it has a role in the recruitment process authorized by Subtitle 7. Under SPP § 7–201(b), "[e]ach unit shall fill vacant skilled service and professional service positions in accordance with a position selection plan."[10] The position selection plan must contain "the information about the position that the Secretary [of DBM] requires," including:

(1) a position description described in § 7–102 of this title;

(2) the minimum qualifications for the class of the position and any selective qualifications required for appointment to the position;

(3) any limitations on selection for the position ... [e.g.] ... candidates indicating a willingness to work in a location.

SPP § 7–202(b). Moreover, "if applicants for the position are to be recruited," the position selection plan must also contain the:

(i) location for submitting applications;

(ii) manner for posting the position announcement in the unit;

(iii) method and length of time for advertising the position;

(iv) closing date to receive applications for the position;

(v) plan of development of any selection test to be administered to qualified applicants; and

(vi) duration of the list of eligibles that results from the recruitment.

---

9. For example, written position plans are a basis for performance evaluations. *See* SPP § 7–102(c)(2)(ii).

10. The General Assembly amended SPP § 7–201 in 2009 (amendments effective October 1, 2009), which significantly reduced an appointing authority's obligations when it: (1) decides to hire by recruitment; (2) demonstrates that the position is difficult to fill; (3) demonstrates that the recruitment must occur in a timely manner; and (4) notifies the Department of the recruitment. 2009 Md. Laws 3853. The OAH, citing *State Ethics Comm'n v. Evans*, 382 Md. 370, 381, 855 A.2d 364 (2004), did not give the amendments retroactive effect because "the personnel decisions giving rise to this Grievance occurred prior to October 1, 2009." Neither party contends that the new version of the law applies to this case. We operate under the assumption that the old requirements apply to the facts of this case.

SPP § 7–202(b)(4). When a draft of a position selection plan is completed, "[t]he appointing authority shall: (1) approve or disapprove each position selection plan; (2) authorize funding for approved plans; and (3) send a copy of an approved selection plan to the equal employment opportunity officer of the unit [in this case, Spring Grove Hospital]." SPP § 7–202(c).

### Selection of Candidates

From here, an appointing authority may select candidates for a position pursuant to SPP § 7–203, which we discussed earlier. Again, under this section, there are two primary ways to fill vacant positions: (1) by selecting "from an existing list of eligible candidates"; or (2) "if no existing list of eligible candidates exists or if the appointing authority decides to recruit for the position, by recruitment...."[11] Reading § 7–203 and § 11–208 in conjunction, we conclude that § 7–203(1)'s "existing list of eligible candidates" encompasses, among others, laid-off employees eligible for reinstatement under § 11–208.

### Job Announcements

If an appointing authority decides to pursue option number two and recruit candidates, then the "appointing authority shall prepare a job announcement for the position and conduct recruitment in accordance with the position selection plan." SPP § 7–204(a). The job announcement must contain:

(1) a summary of the position description;

(2) the minimum qualifications for the class and any selective qualifications necessary for consideration;

(3) the type of selection test that will be administered to those meeting the position's minimum qualifications;

---

**11.** Section 7–203(3) also authorizes an agency to select candidates "from a special list of eligible candidates whom the Division of Rehabilitation Services of the Department of Education certifies as being physically capable and adequately trained to qualify for the position." There was no special list in this case.

(4) the location and deadline for submitting applications; and

(5) the duration of the list of eligibles derived from the announcement.

SPP § 7–204(b). The appointing authority must also "send a copy of the selection plan and job announcement to the Secretary [of DBM] at least 1 week before posting the job announcement to assure public access." SPP § 7–204(c)(1). Furthermore, it is incumbent upon the appointing authority to:

advertise the position vacancy at least 2 weeks before the deadline for submitting applications by:

(i) making available a job announcement to all appropriate State agencies, based on selection limitations; and

(ii) using any other method that is reasonably calculated to ensure a sufficient pool of applicants, including printed advertisements in newspapers and journals, paper and electronic bulletin board postings, and special notices.

SPP 7–204(c)(3).

### Rating Qualified Applicants

After the close of a position announcement, the appointing authority must:

(1) review the applications received to determine the applicants who meet the minimum qualifications for the position;

(2) prepare a register of qualified applicants in random order;

(3) send to unqualified applicants a notice that they have failed to meet the minimum qualifications for the position; and

(4) as provided in subsection (b) of this section,[12] if a competitive examination that requires attendance at a test site is required for the position, send a notice of the

---

**12.** SPP § 7–205(b) addresses situations not relevant to the case before us.

examination to qualified applicants on the register at least 10 days before the test administration date.

SPP § 7–205. In rating qualified applicants, an appointing authority "may use any appropriate selection process," but the "unit must be able to establish the job relatedness, reliability, and validity of the selection tests that it uses." SPP § 7–206(a). If an appointing authority uses a selection test, the test must be free of charge and open to all qualified applicants. SPP § 7–206(b).

Once the appointing authority has rated the qualified applicants, it must, "based on appropriate standards, place the candidates within the following categories":

(i) best qualified;

(ii) better qualified;

(iii) qualified;

(iv) unsatisfactory;

(v) certified by the Division of Rehabilitation Services;

(vi) eligible for reinstatement after layoff or after a separation under § 11–302 of this article;

(vii) eligible for reinstatement; or

(viii) eligible for transfer

SPP § 7–208(a)(1). In addition, the appointing authority must "place the candidates on a list of eligible candidates by category in random order within the category *except* for candidates eligible for reinstatement after layoff or separation under § 11–302 of this article who shall be placed in that category *in seniority point order*." SPP § 7–208(a)(2) (Emphasis added). Subsequently, the appointing authority must file this list of eligible candidates with DBM.

### *Appointments*

Finally, Title 7 provides the framework that an appointing authority must follow in selecting its new employees. Under SPP § 7–209(a), "[e]xcept as otherwise provided by law, an appointing authority shall make an appointment from among

the candidates in a rating category on a list of eligible candidates as follows":

(1) if there are at least five candidates rated best qualified, from that rating category;

(2) if there are fewer than five candidates rated best qualified, from the candidates in the best qualified and better qualified categories; and

(3) if there are fewer than five candidates rated best qualified and better qualified, from candidates in best qualified, better qualified, and qualified categories.

To help decide between candidates within a rating category, SPP § 7–209(c) allows appointing authorities to conduct interviews, as long as it interviews at least three candidates.

After completing these requirements, "[t]he appointing authority must certify to the Secretary [of DBM] that the hiring process was conducted in accordance with the selection plan and this subtitle." SPP § 7–209(d).

### Title 11, Subtitle 2: Layoffs

The Title 11 scheme governing layoffs and reinstatements is more straightforward. Under SPP § 11–203, a layoff is required when a position is abolished or vacated due to a lack of work. Notice of a layoff must be given "to each employee to be affected" at least 60 days before the layoff "is effective." SPP § 11–204. For purposes of a layoff, SPP § 11–205(a) provides that the appointing authority "shall compute the total number of seniority points for each employee subject to the layoff." The order of the layoff according to SPP § 11–206(a)(1) is by seniority points. The employee in the classification with less seniority points "shall be laid off before others in the class with higher seniority points." SPP § 11–206(a)(2).

Under SPP § 2–601(a), when subjected to layoff, each former employee retains reinstatement rights under the SPMS "within 3 years from separation." If reinstated, the employee will be given credit for past State service for seniority, leave accrual and other benefits. PPS § 2–601(b) and (c). If a position is vacant within the same class of jobs and the

appointing authority decides to reinstate, the order of reinstatement is governed by "seniority points." SPP § 11–208(a) provides:

> The employee with the most seniority points shall be the first employee to be reinstated in the class from which the employee was laid off . . . or to any lower class in the same job series within the principal department or other independent unit in which the layoff . . . occurred.

Under SPP § 7–208(a), the appointing authority must maintain a list of laid-off employees and produce such a list for each vacancy that occurs. The list of laid-off employees eligible for reinstatement must be "in seniority point order." SPP § 7–208(a)(2). Eligible candidates have the right to know "their relative standing on the list of eligible candidates." SPP § 7–208(b).

■ From these statutes, DHMH argues that "the ALJ correctly concluded that applicable statutes authorized Spring Grove, in its discretion, to recruit applicants and fill vacancies by selecting from among the best qualified eligible candidates [pursuant to Title 7], without any obligation to select from lists of laid off employees [pursuant to Title 11], such as the grievants." We agree with the ALJ's interpretation of the statute.

While the statutory scheme is complicated, it is not ambiguous. Read together, Titles 7 and 11 provide two paths by which a State agency can fill vacant positions: recruitment through Title 7 or reinstatement pursuant to Title 11. There is nothing in either Title 7 or Title 11 that suggests that, if an agency decides to recruit, it cannot recruit among laid-off employees.[13] There is nothing in either title that states that the two methods are mutually exclusive and, indeed, § 7–208 makes it clear that they are not, because it requires an agency

---

13. As we will discuss in Part II, there are other notice requirements that an Agency must comply with in order to fill vacancies by recruitment. *See* SPP § 7–204.

to categorize candidates within eight categories, including those "eligible for reinstatement." Section 7–208(a)(1)(vii).

In contending that § 11–208 gives laid-off employees an absolute right of reinstatement if the agency subsequently fills vacancies in the same position, appellants rely on SPP § 7–209. The statute provides in relevant part (emphasis added):

**§ 7–209. Appointments.**

(a) In general.—*Except as otherwise provided by law,* an appointing authority shall make an appointment from among the candidates in a rating category on a list of eligible candidates as follows:

(1) if there are at least five candidates rated best qualified, from that rating category;

(2) if there are fewer than five candidates rated best qualified, from the candidates in the best qualified and better qualified categories; and

(3) if there are fewer than five candidates rated best qualified and better qualified, from candidates in best qualified, better qualified, and qualified categories.

Appellants assert that:

SPP § 7–209 requires that the appointing authority choose from among the best qualified, better qualified, and qualified categories, *but only* if no other statute controls. The limiting language that is the preface to SPP § 7–209 makes that clear. The section begins with the qualification, "Except as otherwise provided by law." SPP § 11–208 is just such a set of conditions that is "otherwise provided by law."

\*　　\*　　\*

Where, as here (under SPP § 11–208), there is an express statutory obligation to reinstate, the appointing authority has no cause to choose from the best, better, and qualified categories.

(Emphasis in original).

We do not read the qualifying preface in SPP § 7–209(a), *viz.,* "[e]xcept as otherwise provided by law," as broadly as do appellants. Section 7–209(a) requires an agency to hire from

among the most qualified eligible candidates. An individual's qualifications are irrelevant if a laid-off employee is reinstated because, by statute, reinstatements are on the basis of seniority. The qualifying language in § 7–209 simply reflects that, under some circumstances, an appointing authority is barred from considering qualifications. We could only reach the result suggested by appellants by reading into Subtitle 7 a prohibition against filling a vacant position by recruitment when laid-off employees are also eligible for reinstatement. This we cannot do. *See, e.g., Taylor v. NationsBank, N.A.,* 365 Md. 166, 181, 776 A.2d 645 (2001); *Powell v. Breslin,* 195 Md.App. at 351, 6 A.3d 360.

■ In conclusion, SPP § 7–203 clearly states that an agency can fill vacancies by recruitment or selection from an existing list of eligible candidates. If the list of eligible candidates includes laid-off employees, the laid-off employees must be rehired on the basis of seniority as mandated by Title 11's reinstatement procedure. If the agency makes the effort to recruit in accordance with Title 7, it can hire the candidates it deems to be the best suited for the position. There is no statutory preference for either method—an agency may fill a vacancy through a Title 7 recruitment or a Title 11 reinstatement, or, conceivably, a combination of both. As we previously discussed, there is nothing in the State Personnel and Pensions Article that prevents an agency from directing its recruiting efforts at previously laid-off employees, as occurred in this case. If this is done, the list of applicants that qualify for future employment may include candidates who are eligible for reinstatement pursuant to Title 11 *as well as* candidates who are eligible for appointment after participating in a Title 7 recruitment process.[14] However, as we explore further in part II, if an agency chooses to recruit, it must comply with the statutory requirements set out in Title 7.

---

**14.** Similarly, there is nothing in the State Personnel and Pensions Article that prevents a laid-off employee, who qualifies for reinstatement under Title 11, to participate in a Title 7 recruitment process to potentially increase his or her chances for future employment.

## II. What Actually Occurred in this Case: Did Spring Grove Recruit or Appoint from an Existing List of Eligible Candidates?

■ Appellants contend that Spring Grove did not comply with most of the requirements of SPP §§ 7–202–7–204 in its efforts to recruit among the laid-off DCA's and that, regardless of its protestations to the contrary, Spring Grove:

> actually chose "to hire from the class of laid-off employees." Spring Grove laid off approximately 50 DCAs. According to the Interview Process table, 47 DCAs were laid off, 45 were interviewed, and 2 did not apply. Between nineteen and twenty-two laid-off DCAs were ultimately selected for reinstatement. No other individuals were considered for the vacant DCA positions. No other individuals were offered any of the vacant DCA positions.

Appellants argue that this characterization of the recruitment process is supported by several first-level findings of fact made by the ALJ. In effect, they argue that the findings by the ALJ point ineluctably to the conclusion that Spring Grove's recruitment process was nothing more than a pretext to disguise the fact that Spring Grove was reinstating laid-off DCAs but not on the basis of seniority.

As we will explain, we agree that several findings of fact by the ALJ support appellants' theory. However, for reasons that are not clear from the decision, the ALJ did not make findings of fact as to other relevant issues regarding Spring Grove's compliance with Title 7's requirements for recruiting.

The ALJ concluded that Spring Grove's hiring process was valid because it involved a recruitment, pursuant to Title 7, and not a reinstatement, pursuant to Title 11. It is true that the hiring process resembled a recruitment: as expressed in DHMH's brief, "the Hospital developed a position selection plan . . ., conducted a competitive recruitment to fill the DCA positions, and made offers of employment to those eligible candidates who were determined to be in the 'best qualified' category of candidates for those positions." This notwith-

standing, some of the ALJ's findings are not consistent with her ultimate conclusion.

First, SPP § 7–204(a) states that the appointing authority must "conduct [the] recruitment in accordance with the position selection plan." Thus, the position selection plan must be completed before recruitment commences. On this point, the ALJ found that: (1) "Spring Grove made each offer of employment to fill a vacant DCA position on or after September 16, 2009"; and (2) "All corresponding [position selection plans] were prepared on or about October 6, 2009." Based on these findings, it appears that the position selection plans were drafted weeks *after* the offers were extended for the DCA positions. This does not comply with the statute's requirement.

Second, pursuant to SPP § 7–202(b), a position selection plan must list "the minimum qualifications for the class of the position and any selective qualifications required for appointment to the position" and "any limitations on selection for the position." On this point, the ALJ found that:

> Spring Grove used "Selective Qualifications" in "determining which employees to keep." The Selective Qualifications applied were: the number of [sick days used] by the employee over the prior 12 months, the number of disciplinary actions received by the employee, an interview, and "whether the R.N. supervisor had given any reference letters for those individuals." [(Quoting the testimony of Judy Tullius)].

Spring Grove also considered the number of times "the applicant had been late." The ALJ noted that these " 'Selective Qualifications' were used to limit which employees would be selected for rehire" and that these "Selective Qualifications were *not* noted by Ms. Tullius on the Position Selection Plans . . . ." (Emphasis added).

Our own independent review of the position selection plans confirms that nothing was listed on the forms under "Minimum Qualifications," "Selective Qualifications" or "Limitations On Selection." Because the position selection plans did not

list the minimum qualifications or selection qualifications required for the position, Spring Grove did not comply with the recruitment requirements set out in SPP § 7–202(b).

Third, under SPP § 7–202(b)(4), if an appointing authority chooses to recruit, the position selection plan must contain the following information:

(i) location for submitting applications;

(ii) manner for posting the position announcement in the unit;

(iii) method and length of time for advertising the position;

(iv) closing date to receive applications for the position;

(v) plan of development of any selection test to be administered to qualified applicants; and

(vi) duration of the list of eligibles that results from the recruitment.

None of the position selection plans listed this information. In fact, the preprinted versions of the position selection plan signed by Tullius contained spaces for "Where Job Announcement Will Be Posted" and "Where Candidates Will Apply," (information required under SPP § 7–202(b)(4)), but these spaces were left blank on all of the forms. From this one can infer that no notice of the job openings was posted but, because there might be other explanations for the failure to complete the forms, the matter should be addressed by an ALJ.

Fourth, SPP § 7–204 requires an appointing authority to "prepare a job announcement for the position." This job announcement, together with a copy of the position selection plan, must be sent "to the Secretary [of DBM] at least 1 week before posting the job announcement to assure public access." SPP 7–204(c)(1). Moreover, the appointing authority must "advertise the position vacancy at least 2 weeks before the deadline for submitting the applications...." While there is nothing in the record that indicates that Spring Grove complied with this requirement, the ALJ made no finding on the issue.

Fifth, SPP § 7–209(d) states that "[t]he appointing authority must certify to the Secretary that the hiring process was conducted in accordance with the selection plan and this subtitle." Again, there is nothing in the record that indicates that Spring Grove complied with this requirement but the ALJ made no finding on this issue.

Of all of these requirements, we view SPP § 7–204's provisions relating to public notice and advertising as the most critical. The statute states that "[t]o recruit candidates ..., an appointing authority *shall* prepare a job announcement for the position *and conduct recruitment in accordance with the position recruitment plan.*" SPP § 7–204(a) (emphasis added). The job announcement *shall* contain, among other information, "a summary of the position description [and] the minimum qualifications for the class *and any selective qualifications necessary for consideration.*" SPP § 7–204(b) (emphasis added). The statute further requires an appointing authority to forward copies of the position selection plan and the job announcement to the Secretary of DBM "at least one week prior to posting *to assure public access.*" SPP § 7–204(c)(1). Finally the statute requires an appointing authority to "advertise the vacancy at least 2 weeks before the deadline for submitting applications" by, among other things, "making available a job announcement to all appropriate State agencies based on selection limitations...." SPP § 7–204(c)(3)(i).

Applicants for a State job have a right to know the actual—not merely the purported—criteria by which a position is filled. Equally as important, when a State agency recruits, *all* persons—not only those contacted by the agency—have a right to apply. While some of Title 7's requirements may be technical and primarily designed to facilitate efficient government operations, § 7–204's requirements serve a larger purpose because they assure an open, transparent and fair recruiting process. While appointing authorities are appropriately vested with broad discretion in deciding how to recruit for vacant positions, nothing in Title 7 gives an agency the right to disregard § 7–204's statutory mandates.

■ It follows that, if Spring Grove failed to comply with § 7–204, its efforts to fill the vacant DCA positions cannot be deemed a recruitment. If Spring Grove did not recruit but instead merely appointed candidates from among those recently laid off, it filled the positions through reinstatement. The ALJ found that "[s]eniority points were not considered as a qualification in the hiring decision." If Spring Grove filled the positions through reinstatement, it did so in violation of SPP § 11–208(a)'s mandate that laid-off employees be reinstated solely on the basis of seniority.[15]

We will remand this case to the Office of Administrative Hearings so that an ALJ can complete the fact-finding process as to Spring Grove's compliance with SPP § 7–204 and make conclusions of law based upon those findings and this opinion. If the ALJ concludes that Spring Grove failed to comply with the statute, it should grant appellants' grievance and proceed to determine an appropriate remedy.

### III. The Addition of 17 Grievants to the Grievance Petition

■ As a final matter, DHMH asks us to consider its contention that 17 of the grievants are not eligible to participate in this proceeding because they were not employees at the time the grievance was filed.[16]

This argument is not preserved. In the proceedings before the ALJ, DHMH moved to dismiss the grievance as to all grievants on the basis that it was not timely filed. DHMH asserted that SPP § 12–203 provides that an employee must

---

15. We reiterate: if an agency conducts a recruitment process in compliance with Title 7, and in so doing receives applications from laid-off employees eligible for reinstatement, it may rehire some of those employees based upon their qualifications. If an agency wishes to forgo the recruitment process, it can reinstate from laid-off employees based on seniority. What an agency cannot do is to pick and choose from solely from among laid-off employees based upon the agency's assessment of their qualifications without conducting a valid recruiting process.

16. Two of the 17 grievants are not parties to this appeal.

file a grievance within 20 days of either the date of "the occurrence of the alleged fact that is the basis for the grievance" or the day that the employee became aware of the act. DHMH took the position that the 20 day deadline was triggered by the layoff notices, which were dated August 12, 2009. Thus, the Agency reasoned that the grievance was not timely because it was not filed until October 2. The ALJ denied the motion, stating:

> According to the Agency, the Grievance was late because it was not filed within twenty days of August 12, 2009 [the date DCAs received their layoff notices]. If the Grievants were still contesting Spring Grove's decision to lay them off, I would agree with the Agency; however, I reject the Agency's argument because the Grievants are not contesting the layoff notices [but rather Spring Grove's refusal to reinstate by seniority].

Before this Court, DHMH takes a different tack. It asserts:

> By permitting the belated addition of 17 former employees to the grievance, some seven months after the former employees were laid off by the Hospital, the ALJ "exceed[ed] the statutory authority," *id.*, because the grievance procedure established in Title 12 of the State Personnel and Pensions Article provides an administrative remedy only for certain "employees" within the State Personnel Management System, and not for *former* employees. *See Perry v. Dep't of Health and Mental Hygiene,* 201 Md.App. 633, 639 [30 A.3d 262] (2011).

DHMH's new theory is that the 17 former employees should be excluded because they were no longer employees of the State when they were joined to the grievance. As appellants observe in their reply brief, this argument was not raised at the administrative hearing, thus it cannot be asserted for the first time upon judicial review. *Parham v. DLLR,* 189 Md. App. 604, 615–16, 985 A.2d 147 (2009) (citing *Department of Employment v. Owens,* 75 Md.App. 472, 477, 541 A.2d 1324 (1988)).

THE ORDER OF THE CIRCUIT COURT FOR BALTI-MORE CITY IS VACATED AND THIS CASE IS RE-MANDED TO IT WITH INSTRUCTIONS TO REMAND TO THE OFFICE OF ADMINISTRATIVE HEARINGS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

APPELLEE TO PAY COSTS.